**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CIBC Bank USA f/k/a The PrivateBank and Trust Company, as Administrative Agent, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-3964 |
| v. | ) ) ) | Judge: |
| JH Portfolio Debt Equities, LLC; JH Portfolio Debt Equities 2, LLC; JH Portfolio Debt Equities 4, LLC; and JH Reviver LLC, | ) ) ) ) | Courtroom: |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff CIBC Bank USA f/k/a The PrivateBank and Trust Company ("CIBC" or "Administrative Agent"), as Administrative Agent to the following banks: CIBC, Bankers Trust Company ("Bankers"), Inland Bank and Trust ("Inland"), First Tennessee Bank National Association ("First Tennessee"), ING Capital LLC ("ING"), First Midwest Bank ("FMB"), Busey Bank as successor by merger to First Community Financial Bank ("Busey"), State Bank & Trust Company as successor by merger to AloStar Bank of Commerce ("State Bank") (collectively, the "Lenders"), for its Complaint against JH Portfolio Debt Equities, LLC ("JH"), JH Portfolio Debt Equities 2, LLC ("JH 2"), JH Portfolio Debt Equities 4, LLC ("JH 4"), and JH Reviver LLC ("JHR," together with JH, JH 2, and JH 4, the "Borrowers"), alleges as follows:

### Nature Of The Action

1.    This is an action for breach of contract and other relief pursuant to a certain Second Amended and Restated Credit Agreement dated as of June 29, 2017 by and among the Borrowers and the Lenders (the "Credit Agreement"), as amended from time to time.

**The Parties**

2.　　CIBC is an Illinois state bank with its principal place of business located in Chicago, Illinois.　CIBC is the Administrative Agent for the Lenders.　CIBC is vested with the exclusive right to enforce the Credit Agreement on behalf of the Lenders.

3.　　JH is a California limited liability company with its principal place of business located in Woodland Hills, California.

4.　　JH 2 is a California limited liability company with its principal place of business located in Woodland Hills, California.

5.　　JH 4 is a California limited liability company with its principal place of business located in Woodland Hills, California.

6.　　JHR is a Delaware limited liability company with its principal place of business located, on information and belief, in Woodland Hills, California.

7.　　The Borrowers are each in the business of purchasing portfolios of consumer and merchant loan obligations at a discount off of the face value of such loans (each a "Portfolio") and generating profits by deploying a proprietary collections platform and network of collection agencies to professionally manage the recovery of the amounts due on the accounts.

8.　　JH's sole member is JHCG Holdings LLC, whose sole member is JH Capital Group Holdings LLC, whose sole member in turn is Jacobsen Credit Holdings LLC, whose sole member in turn is Douglas Jacobsen, who, on information and belief, is domiciled in the State of California.

9.　　JH 2's sole member is JH.

10.　　JH 4's 96.16% member is JH.　JH 4's 3.84% member is, on information and belief, Oliphant Financial, LLC, a Florida limited liability company.

11.     JHR's 80% member is JH.  JHR's 20% member is, on information and belief, Reviver Financial, LLC ("Reviver"), a Delaware limited liability company.  On information and belief, National Credit Adjusters, LLC, a Delaware limited liability company is a member of JHR.

12.     The Borrowers are each domiciled in, and therefore citizens for diversity purposes of, the State of California.

<strong>Jurisdiction and Venue</strong>

13.     This Court has jurisdiction of this matter pursuant to 28 U.S.C. §1332(a).

14.     This Court has personal jurisdiction over the Borrowers because in the Credit Agreement, the Borrowers submitted themselves to the jurisdiction of the United States District Court for the Northern District of Illinois, Eastern Division to resolve any disputes relating to the Credit Agreement.

15.     Venue is likewise proper in this Court because the Borrowers agreed to resolve any dispute relating to the Credit Agreement in the United States District Court for the Northern District of Illinois, Eastern Division.

<strong><u>Facts Common to All Counts</u></strong>

<strong>JH as Servicer</strong>

16.     JH is the manager of JH Met Asset Entity LLC, a Delaware limited liability company ("JH Met").

17.     JH is the servicer of certain Portfolios purchased by JH Met ("JH Met Portfolios").  As servicer of the JH Met Portfolios, JH has been collecting payments and proceeds of the JH Met Portfolios.

18.     JH is also the manager of JH CX Asset Entity LLC, a Delaware limited liability company ("JH CX").

19.     JH is the servicer of certain Portfolios purchased by JH CX ("JH CX Portfolios"). As servicer of the JH CX Portfolios, JH has been collecting payments and proceeds of the JH CX Portfolios.

20.     JH is the sole member of JHPDE Finance I, LLC, a Delaware limited liability company ("JHPDE Finance I").

21.     JH is the servicer of certain Portfolios purchased by JHPDE Finance I ("JHPDE Finance I Portfolios").  As servicer of the JHPDE Finance I Portfolios, JH has been collecting payments and proceeds of the JHPDE Finance I Portfolios.

22.     On information and belief, JHPDE Finance I has a separate credit facility which JHPDE Finance I uses to finance the acquisition of certain JHPDE Finance I Portfolios.

23.     On information and belief, JHCG Holdings LLC ("JHCG"), the sole member of JH, also has a separate credit facility with Citibank, N.A. ("Citibank").

24.     On or about June 28, 2017, JH Capital Group Holdings LLC ("JH Capital"), which is the sole member of the sole member of JH, entered into an investment agreement with Easterly Acquisition Corp., pursuant to which (a) Easterly Acquisition Corp. agreed to make an investment in JH Capital, and (b) the owners of JH Capital obtained rights to exchange their interests in JH Capital for publicly traded shares in Easterly Acquisition Corp. (the "Easterly Transaction").

**The Loans**

25.     On or about June 29, 2017, the Borrowers entered into the Credit Agreement with the Lenders.  A true and correct copy of the Credit Agreement is attached hereto as Exhibit A.

26. The Credit Agreement provided the Borrowers with a revolving line of credit from which they could borrow money from the Lenders (collectively, the "Loans") in an aggregate amount not to exceed the lesser of the Aggregate Commitments (hereafter defined) and the Borrowing Base Amount (as such term is defined in the Credit Agreement).

27. Under the Credit Agreement, the total aggregate commitments of the Lenders was $182,000,000.00 (the "Aggregate Commitments"). *See* Ex. A, Schedule II.

28. Under the Credit Agreement, if for any reason and at any time the outstanding balance of the Loans exceeded the lesser of the Aggregate Commitments or the Borrowing Base Amount (an "Overadvance"), then the Borrowers are required to immediately repay the Lenders an aggregate amount equal to such Overadvance. *See* Ex. A, § 2.03(a).

29. The Loans are evidenced by eight (8) separate promissory notes made by the Borrowers and payable to and for the benefit of each Lender (each a "Note," collectively, the "Notes") in the aggregate principal amount of $182,000,000.00. True and correct copies of the Notes are attached hereto as Group Exhibit B.

30. The CIBC Note is in the original principal amount of $45,000,000.00.

31. The First Tennessee Note is in the original principal amount of $27,000,000.00.

32. The ING Note is in the original principal amount of $30,000,000.00.

33. The State Bank Note is in the original principal amount of $20,000,000.00.

34. The FMB Note is in the original principal amount of $20,000,000.00.

35. The Bankers Note is in the original principal amount of $20,000,000.00.

36. The Inland Note is in the original principal amount of $10,000,000.00.

37. The Busey Note is in the original principal amount of $10,000,000.00.

38. Each of the Notes incorporates by reference the express terms of the Credit Agreement. *See* Ex. B.

39. To secure repayment of the Loans under the Credit Agreement as evidenced by the Notes, the Borrowers executed and delivered to the Lenders a certain Security Agreement dated as of June 29, 2017, as amended from time to time (the "Security Agreement"). A true and correct copy of the Security Agreement is attached hereto as Exhibit C. The Security Agreement grants to the Lenders a first priority security interest in all of the collateral of the Borrowers described in Section 2.1 of the Security Agreement, including but not limited to the Portfolios owned by the Borrowers. *See* Ex. C, § 2.1.

40. The Credit Agreement and Security Agreement have each been amended from time to time. True and correct copies of those certain amendments are attached hereto as Group Exhibit D.

**Facts Relating to the Credit Agreement**

41. The Credit Agreement provides that the Portfolios are to be valued by JH by calculating the Estimated Remaining Value for each individual portfolio ("ERV"), based upon: (a) estimated collections on a Portfolio less estimated fees for the costs of such collections; and (b) a method and set of assumptions determined by JH which are consistent with JH's past practices and fully disclosed and approved by the Administrative Agent and the Lenders; provided, however, that such valuations exclude (x) certain types of loans, including but not limited to Payday Loans and Predatory Lending Loans (as such terms are defined in the Credit Agreement), and (y) collections that are estimated to be collected after a certain specified month. *See* Ex. A, p. 5.

42.     Under the Credit Agreement, the Borrowing Base Amount is to be calculated based upon a specified percentage of the Borrowers' ERV for a Portfolio owned by a Borrower, plus a Borrower's share of the ERV for the JH Met Portfolios, plus a Borrower's share of the ERV for the JH CX Portfolios.  *See* Ex. A, pp. 4-5.

43.     The Credit Agreement also requires the Borrowers to provide the Administrative Agent and the Lenders with certain information with respect to (a) the Portfolios owned by the Borrowers, (b) the JH Met Portfolios and (c) the JH CX Portfolios within thirty (30) days after the end of each month.  *See* Ex. A, § 6.02(c).

44.     Likewise, the Borrowers are required to provide the Administrative Agent and the Lenders with certain specified information with respect to (a) JH Met, (b) the JH Met Portfolios, (c) JH CX and (d) the JH CX Portfolios within thirty (30) days after the end of each month (each a "Portfolio Report").  *See* Ex. A, § 6.02(g).

45.     Additionally, within thirty (30) days after the end of each month, the Borrowers are required to provide the Administrative Agent and the Lenders with Borrowing Base Certificates (as that term is defined in the Credit Agreement) which contain a calculation of the Borrowing Base Amount as of the end of the preceding month.  *See* Ex. A, § 6.02(a).  The form of Borrowing Base Certificate is attached to the Credit Agreement as Exhibit C thereto.  *See* Ex. C to Ex. A.

46.     Within one hundred twenty (120) days after the end of each fiscal year, the Borrowers are required to provide the Administrative Agent and the Lenders with consolidated and consolidating financial statements as of the end of such fiscal year.  *See* Ex. A, § 6.01(a).

47.     Furthermore, within thirty (30) days after the end of each month, the Borrowers are required to provide the Administrative Agent and the Lenders with monthly financial statements as of the end of each month.  *See* Ex. A, § 6.01(b).

48.     The Borrowers also are required to comply with certain financial covenants and collection performance standards for the Portfolios, including but not limited to compliance with a maximum amount of a leverage ratio to be tested on a monthly basis.  *See* Ex. A, § 7.11.

49.     The Borrowers are also required to provide the Administrative Agent and the Lenders with a certificate containing the calculation of certain financial covenants and collection performance of the Portfolios owned by the Borrowers, the JH Met Portfolios and the JH CX Portfolios within thirty (30) days after the end of each month (each, a "Compliance Certificate"). *See* Ex. A, § 6.02(b).

50.     Moreover, the Borrowers are required to provide the Administrative Agent and the Lenders with details of dividends, distributions or similar payments made, directly or indirectly, to any equity holder of a Borrower and any payments of interest, principal, fees or reimbursement to the holders of Subordinated Debt and Approved Debt (as each such term is defined in the Credit Agreement).  *See* Ex. A, § 6.02(e).

51.     In addition, the Credit Agreement requires the Borrowers to provide the Administrative Agent and the Lenders with copies of any investor materials promptly after such materials are made available to the investors in the Borrowers, JHCG and JH Capital.  *See* Ex. A, § 6.02(h).

52.     The Borrowers also are required to provide the Administrative Agent and the Lenders with copies of (a) each settlement statement, financial statement or other report or communication delivered by JH, JHCG or JH Capital pursuant to the credit facility with

Citibank, and (b) each financial statement or other report or communication delivered to Citibank by JHPDE Finance I pursuant to its credit facility. *See* Ex. A, § 6.02(j).

### Defaults Under the Loans

53.    The Borrowers calculated the Borrowing Base Amounts for the months ending June 30, 2017, July 31, 2017, August 31, 2017, September 30, 2017, October 31, 2017, November 30, 2017, December 31, 2017 and January 31, 2018 and thereafter drafted, executed and delivered the Borrowing Base Certificates for those months by providing the same to the Administrative Agent and the Lenders.

54.    The Borrowing Base Certificates completed by the Borrowers and provided to the Administrative Agent and Lenders for the months ending June 30, 2017, July 31, 2017, August 31, 2017, September 30, 2017, October 31, 2017, November 30, 2017, December 31, 2017 and January 31, 2018 contained materially false, misleading and incorrect information.

55.    Specifically, the Borrowers inflated the applicable Borrowing Base Amounts by including 100% of the ERV of the JH Met Portfolios and the JH CX Portfolios without excluding the portion of the ERVs which were allocated to certain joint venture partners, as required under the Credit Agreement. *See* Ex. A, p. 13; *see also* ¶ 42, *supra*.

56.    In addition, the Borrowers inflated their Borrowing Base Amount in violation of their obligations under the Credit Agreement by modifying their assumptions and projections in calculating the ERV of Portfolios in breach of their obligations under the Credit Agreement, which increased the ERV amount without disclosure to or approval by the Administrative Agent or the Lenders. *See* Ex. A, pp. 4-5; *see also* Ex. A, § 6.02(d); *see also* ¶ 41(b), *supra*.

57.    Furthermore, in violation of the Credit Agreement, the Borrowers inflated their Borrowing Base Amount by failing to exclude collections that were estimated to be collected

after a certain specified month without disclosure to or approval by the Administrative Agent and the Lenders. *See* Ex. A, pp. 11-12.

58.     On information and belief, as of December 31, 2017, through their actions, the Borrowers had improperly caused the Borrowing Base Amount to be increased by not less than $80,000,000.00, thus in turn improperly causing the Lenders to advance more than $80,000,000.00 above the limits set forth in the Credit Agreement (the "Overadvance").

59.     Had the Borrowers not submitted to the Lenders materially false, misleading and incorrect information on the Borrowing Base Certificates, the Lenders would not have advanced the Overadvance to the Borrowers.

60.     The Overadvance was not immediately repaid as required by Section 2.03(a) of the Credit Agreement. *See* Ex. A, § 2.03(a). This constitutes an Event of Default under the Credit Agreement. *See* Ex. A, § 8.01(a).

61.     Moreover, under Section 8.01(d) of the Credit Agreement, an Event of Default occurs if, "[a]ny written representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrowers or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith *shall be incorrect or misleading in any material respect* when made or deemed made." *See* Ex. A, § 8.01(d) (emphasis added).

62.     The Borrowers delivered materially false, incorrect and misleading information to the Administrative Agent and the Lenders with respect to the calculation of the Borrowing Base Amount, Applicable Projections and Portfolio Reports, each of which constitutes an independent Event of Default under the Credit Agreement. *See* Ex. A, § 8.01(d).

63.     Furthermore, despite the requirement in Section 6.02(a) of the Credit Agreement to provide the Administrative Agent and the Lenders with Borrowing Base Certificates, the Borrowers failed to deliver Borrowing Base Certificates for the months ending February 28, 2018, March 31, 2018 and April 30, 2018.  These failures constitute additional Events of Default under Section 8.1(b) of the Credit Agreement.  *See* Ex. A, § 8.01(b).

64.     On information and belief, the Borrowers stopped providing the Administrative Agent and the Lenders with Borrowing Base Certificates, Compliance Certificates and Portfolio Reports after the Administrative Agent and the Lenders informed the Borrowers of the irregularities described above.

65.     Additionally, the Borrowers failed to deliver to the Administrative Agent and the Lenders Compliance Certificates and Portfolio Reports within thirty (30) days after the end of each month ending February 28, 2018, March 31, 2018 and April 30, 2018, as required under Sections 6.02(b) and 6.02(c) of the Credit Agreement.  *See* Ex. A, §§ 6.01(b) and (c).  Such failures constitute further Events of Default under the Credit Agreement.  *See* Ex. A, § 8.01(b).

66.     The Borrowers also failed to comply with the maximum Leverage Ratio requirement as set forth in Section 7.11(a) of the Credit Agreement.  *See* Ex. A, § 7.11(a).  This failure constitutes an additional Event of Default under Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

67.     Similarly, the Borrowers failed to comply with the minimum Excess Collateral Availability requirement as set forth in Section 7.11(d) of the Credit Agreement.  *See* Ex. A, § 7.11(d).  This failure constitutes an additional Event of Default under Section 8.01(b) of the Credit Agreement.  *See* Ex. A, § 8.01(b).

68. The Borrowers failed to comply with the maximum Book Leverage Ratio requirement as set forth in Section 7.11(e) of the Credit Agreement. *See* Ex. A, § 7.11(e). This failure constitutes another Event of Default under Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

69. Moreover, the Borrowers failed to comply with the minimum Net Worth requirement as set forth in Section 7.11(g) of the Credit Agreement. *See* Ex. A, § 7.11(g). This failure constitutes yet another Event of Default under Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

70. The Borrowers failed to notify the Administrative Agent and the Lenders of any of the aforementioned Events of Default within one business day thereof, as required under the Credit Agreement. This failure constitutes an additional Event of Default under Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

71. The Borrowers failed to deliver to the Administrative Agent and the Lenders audited financial statements for the fiscal year ending December 31, 2017 as required under Section 6.01(a) of the Credit Agreement. This failure constitutes still another Event of Default pursuant to Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

72. The Borrowers failed to deliver to the Administrative Agent and the Lenders the monthly financial statements for the months ending February 28, 2018, March 31, 2018 and April 30, 2018, which constitutes an Event of Default pursuant to Section 8.01(b) of the Credit Agreement. *See* Ex. A, § 8.01(b).

73. The Borrowers also failed to provide the Administrative Agent and the Lenders with details of dividends, distributions or similar payments made to any, direct or indirect, equity holder of a Borrower or any payments of interest, principal, fees or reimbursement to the holders

of Subordinated Debt and Approved Debt as required under Section 6.02(e) of the Credit Agreement. *See* Ex. A, § 6.02(e). These failures by the Borrowers constitute additional Events of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

74.     The Borrowers also failed to deliver to the Administrative Agent and the Lenders copies of investor materials relating to JHCG Holdings LLC and JH Capital Group Holdings LLC as required under Section 6.02(h) of the Credit Agreement. *See* Ex. A, § 6.02(h). This failure by the Borrowers constitutes an Event of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

75.     Additionally, notwithstanding the requirements set forth in Section 6.02(j) of the Credit Agreement, the Borrowers failed to deliver to the Administrative Agent and the Lenders copies of each of the following: (a) each settlement statement, financial statement or other report or communication delivered by JH, JHCG, and JH Capital pursuant to the credit facility with Citibank; and (b) each financial statement or other report or communication delivered by JHPDE Finance I pursuant to its credit facility. *See* Ex. A, § 6.02(j). These failures by the Borrowers constitute additional Events of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

76.     Furthermore, in violation of Section 7.06(f) of the Credit Agreement, the Borrowers made distributions and payments to Oliphant Financial, LLC and Reviver while Events of Default existed under the Credit Agreement. *See* Ex. A, § 7.06(f). The Borrowers also improperly made distributions in excess of the amounts required by the organizational documents for JH 4 and JHR. *See id*. These violations by the Borrowers constitute further Events of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

77.     Similarly, the Borrowers violated Section 7.06(g) of the Credit Agreement by making distributions and payments to joint venture partners while Events of Default existed

under the Credit Agreement, and made distributions in excess of the amounts required by the organizational documents for JH Met and JH CX. *See* Ex. A, § 7.06(f). These violations by the Borrowers constitute Events of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

78. The Borrowers also paid certain expenses to or for the benefit of JH Capital with respect to the Easterly Transaction in violation of Section 7.11 of the Credit Agreement. *See* Ex. A, § 7.11. This violation by the Borrowers constitutes an Event of Default under the Credit Agreement. *See* Ex. A, § 8.01(b).

79. On information and belief, the Borrowers paid not less than $18,000,000.00 with respect to the Easterly Transaction.

80. Importantly, the Borrowers failed to maintain proper books of record and account and make full, true and correct entries (in conformity with general accepted accounting principles consistently applied) therein with respect to all financial transactions and matters involving the assets and business of each Borrower. *See* Ex. A, § 6.09. These violations by the Borrowers of Section 6.09 of the Credit Agreement constitute Events of Default under the Credit Agreement. *See* Ex. A, §§ 6.09 and 8.01(b).

81. On information and belief, the Borrowers co-mingled and continue to co-mingle all cash collections with respect to the Portfolios owned by the Borrowers, the JH Met Portfolios, the JH CX Portfolios and the JHPDE Finance I Portfolios, and improperly and routinely use any such available cash for expenses of the Borrowers regardless of the source.

82. Due to the occurrence of the numerous aforementioned Events of Default, on or about May 21, 2018, CIBC, as Administrative Agent, sent the Borrowers a Default Notice Reservation of Rights. A true and correct copy of the Default Notice Reservation of Rights is attached hereto as <u>Exhibit E</u>.

83.     On June 6, 2018, CIBC, as Administrative Agent, accelerated the indebtedness by sending to the Borrowers a Notice of Acceleration; Notice of Set Off; Demand for Payment; and Reservation of Rights Letter (the "Acceleration Letter").  Pursuant to the Acceleration Letter, the Lenders have accelerated all amounts due and owing pursuant to the Credit Agreement declaring all such amounts to be immediately due and owing, and demanding immediate repayment of the same.  A true and correct copy of the Acceleration Letter is attached hereto as Exhibit F.

84.     Despite demand, as of the date of filing of this action, the Borrowers have failed to pay all amounts due and owing to the Lenders under the Credit Agreement.

## COUNT I – BREACH OF CONTRACT

85.     The Administrative Agent re-alleges, restates and incorporates by reference paragraphs 1 through 84 above as if fully set forth herein.

86.     The Borrowers entered into the Credit Agreement with the Administrative Agent and the Lenders, which constitutes a valid and binding contract, supported by consideration.  *See generally*, Ex. A.

87.     The Borrowers breached the Credit Agreement by, among other things: (a) failing to make payment to the Lenders when due; (b) providing materially false, incorrect and misleading financial information to the Administrative Agent and the Lenders to induce the Lenders to over advance funds in the amount of not less than $80,000,000.00; and (c) failing to provide the Administrative Agent and the Lenders with certain required financial statements, reports, certificates, documents and disclosures.

88.     The Administrative Agent and the Lenders have performed all of their respective obligations under the Credit Agreement.

89. Under the Credit Agreement, the total amount of principal due and owing to the Lenders as of June 6, 2018 is $172,500,000.00.

90. The Lenders have been damaged in an amount not less than $172,500,000.00 by the Borrowers' numerous breaches of the Credit Agreement.

91. Section 11.03 of the Credit Agreement provides that "the authority to enforce rights and remedies [under the Credit Agreement] and under the other Loan Documents against the [Borrowers] or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 [of the Credit Agreement] for the benefit of all and the Lenders." *See* Ex. A, §§ 8.02(c) and 11.03.

92. Moreover, pursuant to Section 11.04(a) of the Credit Agreement, the Administrative Agent and the Lenders are entitled to recover their attorneys' fees, court costs and expenses incurred in prosecuting this action and in connection with any workout, enforcement and protection of Administrative Agent and the Lenders rights. *See* Ex. A, § 11.04(a).

93. It has been and is necessary for the Administrative Agent to institute this action for collection of the amounts owed under the Credit Agreement, and the Administrative Agent has been compelled to, and has employed the firm of Dykema Gossett PLLC as its attorneys to institute and prosecute this action, and therefore, the Administrative Agent and the Lenders are entitled to recover its attorneys' fees, costs and expenses for the services of said attorneys.

94. As a consequence of the Events of Default described above, it has been necessary and remains necessary for the Administrative Agent and the Lenders to engage certain independent contractors to: (a) conduct an updated appraisal of the Portfolios owned by the

Borrowers, the JH Met Portfolios and the JH CX Portfolios; and (b) examine and audit the Borrowers' corporate, financial and operating records, including records relating to the Portfolios. Pursuant to Section 6.10 of the Credit Agreement, all fees and expenses of the independent contractors shall constitute additional obligations of the Borrowers and demand is hereby made for the immediate payment of same.

95.    Finally, given the occurrence of the numerous Events of Default described above, specifically, the Borrowers having provided the Administrative Agent and the Lenders with incorrect and materially misleading information, the Administrative Agent will, by separate motion, seek the appointment of a receiver for each of the Borrowers.

WHEREFORE, CIBC Bank USA f/k/a The PrivateBank and Trust Company, as Administrative Agent, prays that this Court enter an order:

(a)    entering judgment against the Borrowers, JH Portfolio Debt Equities, LLC, JH Portfolio Debt Equities 2, LLC, JH Portfolio Debt Equities 4, LLC, and JH Reviver LLC, in favor of the Administrative Agent, in the principal amount of at least $172,500,000.00 as of June 6, 2018, plus interest, attorneys' fees, costs and expenses, and the fees, costs and expenses of any required independent contractors for the Administrative Agent;

(b)    appointing a receiver for each of the Borrowers consistent with the Motion to Appoint Receiver; and,

(c)    granting such other and further relief as this Court may deem just and proper.

Dated:  June 6, 2018                            Respectfully submitted,


                                                By:    s/ Mark A. Silverman          
                                                **One of the Attorneys for CIBC Bank USA f/k/a The PrivateBank and Trust Company, as Administrative Agent**

Edward S. Weil (ARDC # 6194191)
(eweil@dykema.com)
Mark A. Silverman (ARDC # 6307006)
(msilverman@dykema.com)
Molly E. Thompson (ARDC # 6293942)
(mthompson@dykema.com)
Dykema Gossett PLLC
10 South Wacker Drive, Suite 2300
Chicago, Illinois  60606
Telephone:  (312) 876-1700
Facsimile:  (312) 876-1155

4837-0580-3623.9
104085\000280