THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CIBC Bank USA f/k/a The Private Bank and Trust Company, as Administrative Agent, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-3964 |
| v. | ) ) ) | Judge John Z. Lee |
| JH Portfolio Debt Equities, LLC; JH Portfolio Debt Equities 2, LLC; JH Portfolio Debt Equities 4, LLC; and JH Reviver LLC, | ) ) ) ) | Magistrate Judge Daniel G. Martin |
| Defendants. | ) ) | |

**DEFENDANTS' SURREPLY IN OPPOSITION TO
PLAINTIFF'S MOTION FOR ORDER APPOINTING RECEIVER**

Pursuant to the Court's Order of July 31, 2018 (Doc. 37), Defendants JH Portfolio Debt Equities, LLC, JH Portfolio Debt Equities 2, LLC, JH Portfolio Debt Equities 4, LLC, and JH Reviver LLC ("JH" or "Defendants"), respectfully submit the following surreply.[1] For the reasons stated in JH's Response ("Response," Doc. 26) and below, CIBC has not met its burden to establish an urgent necessity for the extraordinary remedy of appointing a receiver, let alone one with the power to conduct a pre-judgment liquidation of the assets of JH. The Court should deny CIBC's Motion for Order Appointing Receiver (Doc. 8).[2]

**1. JH's business – and thus the status quo – is to collect on the accounts included in the debt portfolios that serve as collateral.**

In its Reply ("Reply," Doc. 27), CIBC argues that Defendants' use of collateral is a change from the status quo. (Reply at 5-7; *see also* Rebuttal Declaration of Matthew Berman ("Berman Rebuttal Dec.") (Doc. 27-1) at ¶ 6.) However, this misstates the status quo. As CIBC alleges, JH

---

[1] JH also has submitted the declaration of Matthew Kvarda and the supplemental declarations of Paul Barkes, Keri Krisan, and Anthony Riggio.

[2] This surreply incorporates the defined terms from the Response and supporting materials.

is in the business of purchasing portfolios of loan obligations at a discount to the face value and generating profits by deploying a proprietary collections process to recover the amounts due on the accounts. (*See* Complaint (Doc. 1) at ¶ 7.). Thus, the status quo for JH is to continue its normal business of using the collateral – which for JH means collecting on the accounts in its debt portfolios. It is CIBC that seeks to disrupt the status quo through the appointment of a receiver that would sell off JH's operating assets, *i.e.*, the debt portfolios. (*See* Proposed Order Appointing Receiver (Doc. 8-4), § VIII, Managing Assets.)

With respect to the Defendants' use of *cash* collateral, CIBC ignores that a significant portion of the cash has been used to satisfy the monthly non-default interest payment on the debt accrued under the Credit Agreement. (*See* Supplemental Declaration of Anthony Riggio ("Riggio Supp. Dec.") at ¶ 4.) The JH Entities were current on these payments through July 13, 2018. (*Id.*) The remaining monthly spending covers JH's operating expenses, including expenses necessary to execute JH's business plan. (*Id.*)

2.  **The value of JH's Debt Portfolios (*i.e.*, the collateral) would be severely diminished in the hands of a liquidating receiver.**

CIBC does not deny that it seeks the appointment of a receiver with the power to sell all of Defendants' operating assets, but refuses to acknowledge the obvious resulting harm to Defendants and third parties from such a liquidation. (Reply at 9*; see also* Response at 10-12.) CIBC knows that the debt portfolios of JH are far more valuable if they continue to be used in the manner intended under the Credit Agreement – with JH collecting on the accounts included in the debt portfolios. Collecting on the debt portfolios is consistent with the use of collateral as contemplated under the Credit Agreement. Liquidation is an extreme departure therefrom, and will result in a lower recovery for all.

CIBC knows this. CIBC engaged an expert to value the JH debt portfolios. (*See* Riggio Supp. Dec. at ¶ 7.) JH requested CIBC's consent to use the expert valuation in this action, including offering to enter into a protective order to preserve the confidentiality of the valuation, but CIBC refused. (*Id*.) The only logical explanation for CIBC's refusal is that the valuation demonstrates the value of the debt portfolios would be severely impaired if liquidated. The debt portfolios will yield materially greater proceeds if JH continues to employ its current collection strategy and will be even more valuable if JH continues with its plan to implement a more aggressive collection strategy. (*Id*. at ¶¶ 5-7.)

In addition, JH has engaged an investment bank, Houlihan Lokey, to develop a plan for a potential acquisition, recapitalization, refinancing or other transaction that would retire the CIBC debt facility. (*See* Declaration of Matthew E. Kvarda ("Kvarda Dec.") at ¶ 11.)

The JH Entities are significantly more likely to secure financing or investment to replace the CIBC debt (as JH has been working to accomplish) if JH continues its normal business of converting the debt portfolios into revenue. Putting a receiver in control of the debt portfolios would prevent JH from obtaining substitute financing. (*See* Riggio Supp. Dec. at ¶ 8.)

**3.     JH moved its bank accounts in response to CIBC's breach of contract.**

CIBC complains that JH moved its bank accounts from CIBC to another financial institution. (Reply at 4; Berman Rebuttal Dec. at ¶¶ 7-10.) JH disclosed these new accounts to CIBC and addressed them in the Response. (*See* Barkes Dec. (Doc. 26-34) at ¶¶ 3-7.) As further explanation, the new accounts were also necessitated by CIBC's breach of the parties' Deposit Account Control Agreement ("DACA"). (*See* Answer, Affirmative Defenses, and Counterclaims (Doc. 31,) at 28-31, ¶¶ 1-20; *see, generally,* Supplemental Declaration of Keri Krisan ("Krisan Supp. Dec.").)

The DACA governs the management of cash in certain JH accounts and was established in connection with the Credit Agreement. (*See* Doc. 26-30, in part; s*ee* DACA, §1.) Under the DACA, CIBC is contractually required to manage the accounts per the DACA's terms, including the instructions of JH. CIBC failed to do this. In breach of CIBC's obligations under the DACA, CIBC refused to transfer *non-collateral* cash to bank accounts not subject to the DACA pursuant to JH's directions. On June 6, 2018, in an additional breach of the DACA, and without warning, CIBC seized and swept $2,444,975.12 of JH's *non-collateral* cash. (*See* Krisan Supp. Dec. at ¶¶ 5-8.) CIBC knew that this amount was not collateral because JH had been reporting to CIBC the source of all funds in the accounts on a daily basis. (*Id.* at ¶ 6.)

In response to the sweep, Defendants were forced to protect their non-collateral cash by opening alternate accounts. JH disclosed this protective measure to CIBC, as well as where those alternative accounts are held, and the daily contents and valuation of those accounts. (*See* Barkes Dec. at ¶¶ 3-7; *see also* Krisan Dec. at ¶ 6.) The actions of JH in this regard have been transparent.

**4.      CIBC ignores its contractual legal remedies.**

CIBC continues to argue that it lacks an adequate alternative remedy sufficient to protect itself in advance of a judgment in the current dispute. (*See* Reply at 7-8.) However, as explained in JH's Response, CIBC bargained for the specific remedy of foreclosure – a remedy it has chosen not to pursue. (*See* Response at 10; Security Agreement (Doc. 1-3) §§ 5.2(a) ("Possession and Assembly of Collateral") and (b) ("Sale of Collateral").) In addition to this right of foreclosure, CIBC *is already* availing itself of other legal remedies it claims to lack. Buried in note 3 to its Reply, Plaintiff acknowledges that it has brought claims in Delaware state court to recover the same monies from JH and certain of its joint venture partners about which it complains in the instant motion before this Court. (*See* Reply at 4-5, n.3.)

4

5. **The CRO engaged by JH serves the same role as an oversight receiver.**

In its Reply, CIBC argues that the appointment of Matthew Kvarda as Chief Restructuring Officer is an ineffective measure, lacking in equivalency to the appointment of federal receiver. (*See* Reply at 12-13.) As CIBC knows, Mr. Kvarda, a Managing Director with Alvarez & Marsal, is a highly skilled restructuring professional with over 25 years of experience – he has experience in the consumer finance sector and has led all aspects of the turnaround and restructuring process including developing short term cash flow forecasts and long term business plans. (*See* Kvarda Dec. at ¶¶ 4-7.) Mr. Kvarda's role as CRO closely mirrors, if not exceeds, that of the "limited financial receiver" appointed in *JPMorgan Chase Bank, N.A. v. Heritage Nursing Care, Inc.*, 2007 WL 2608827, *11 (N.D. Ill. Sept. 6, 2007). Mr. Kvarda's duties include (i) a financial review of JHPDE, including, but not limited to, the review and assessment of financial information provided to JHPDE's creditors, such as CIBC; (ii) the identification and implementation of cost reduction and operation improvement opportunities; (iii) assisting JHPDE in developing plans and alternatives for maximizing the Company's value; and (iv) serving as the principal contact with JHPDE's creditors with respect to the Company's financial and operational matters. (*See* Kvarda Dec. at ¶¶ 8-9; *see also*, Alvarez & Marsal engagement letter (Doc. 26-16) at 1-2.) Mr. Kvarda is in frequent contact with CIBC concerning issues such as current and projected cash flows, operational updates, and various potential restructuring alternatives. (*See* Kvarda Dec. at ¶ 10.)

6. **CIBC mischaracterizes the declarations submitted by JH.**

In section E of the Reply, CIBC mischaracterizes the testimony of Anthony Riggio, Todd Harrington, Paul Barkes, and Keri Krisan as "admissions." (*See* Reply at 9-11.) Because the actual testimony does not fit the story CIBC seeks to tell, it again resorts to name-calling by arguing that JH engaged in "manipulation" and "comingling." (Reply at 9-10.)

5

For example, CIBC portrays the errors in the Borrowing Base calculations – that JH has worked with CIBC to resolve – as intentional "manipulation." (*See* Reply at 9.) CIBC also continues to characterize the fact that JH previously did not maintain segregated accounts as "comingling." (*See id*. at 10.) CIBC provides no evidence of such bad intent because none exists. CIBC fails to acknowledge the extensive remedial efforts regarding the borrowing base calculations. CIBC also fails to acknowledge that JH has now opened segregated accounts. CIBC exaggerates the evidence to fit the fact patterns of the few cases it cites where a court appointed an oversight receiver. But the facts here do not warrant the appointment of a receiver, let alone one with the power to liquidate all of Defendants' assets.

**7.      CIBC mischaracterizes the expenses related to JH's proposed corporate change.**

In his Rebuttal Declaration, Mr. Berman mischaracterized the nature of $18,466,000 in expenses paid by JH. (*See* Berman Rebuttal Dec. at ¶¶ 11-12.) As Mr. Riggio explained in his initial declaration, beginning in mid-2017, JH and its related entities were contemplating a major organizational change. (*See* Riggio Dec. at ¶ 53 (Doc. 26-31).) The change would have transitioned JH Capital Group Holdings, LLC ("JH Capital") into a publicly traded entity. As a part of that process, JH Capital engaged PricewaterhouseCoopers and EY to assist in auditing and accounting measures for JH Capital and its subsidiaries, including JH. (*See* Riggio Dec. at ¶ 53).

In his rebuttal declaration, Mr. Berman asserts that JH paid expenses related to the abandoned transaction, which Mr. Berman states "was terminated in June 2018." (Berman Rebuttal Dec. ¶ 11.) This creates the impression that the expenses were paid in June 2018, *i.e.* after this action was filed. They were not. Of the $18,466,000 identified by Mr. Berman as "SPAC-related expenses" (Berman Rebuttal Dec. ¶ 12) all were paid prior to or in April 2018. (*See* Krisan Supp. Dec. at ¶ 12.) The vast majority of this amount – $15,293,000 – was paid in 2017 through February

6

2018, before the issues that arose with respect to the calculation of JH's Borrowing Base. (*See* Krisan Supp. Dec. at ¶ 12.)

**8.     The balance of harms outweighs the appointment of a receiver.**

CIBC's briefing does not address the harm to JH and others if a receiver were to be appointed. As demonstrated in JH's Response and initial declarations, the imposition of a receiver would severely and negatively impact JH, its creditors, and joint venture partners. (*See* Response at ¶ 11 and declarations cited therein.) In addition, as explained in the supplemental declaration of Paul Barkes, the appointment of a receiver would be in direct conflict with the rights of Citibank, N.A., as a lender to JHCG Holdings LLC. (*See* Supplemental Declaration of Paul Barkes at ¶¶ 3-10.) Also, CIBC's proposed order appointing a receiver would prohibit Fortress Credit Corp., as a lender to JHPDE Finance I, LLC, from exercising remedies with respect to assets pledged under the related lending agreements and grant the receiver authority over assets excluded from CIBC's Security Agreement. (*See id*. at ¶¶ 11-18.)

*Conclusion*

For the foregoing reasons, Defendants respectfully request that the Court enter an order denying Plaintiff's Motion for Order Appointing Receiver.

Dated: August 8, 2018  Respectfully submitted,

*/s/ Greg Shinall*

Greg Shinall
Robert D. Cheifetz
Martin Sinclair
SPERLING & SLATER, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
(312) 641-3200
shinall@sperling-law.com
robc@sperling-law.com
msinclair@sperling-law.com

*Counsel for the Defendants*
JH Portfolio Debt Equities, LLC;
JH Portfolio Debt Equities 2, LLC;
JH Portfolio Debt Equities 4, LLC; and
JH Reviver LLC

8

## CERTIFICATE OF SERVICE

      I, Greg Shinall, hereby certify that on August 8, 2018, I caused a true and correct copy of the foregoing **Defendants' Surreply in Opposition to Plaintiff's Motion for Order Appointing Receiver** to be served upon the following individuals via ECF Electronic Case Filing:

Edward S. Weil
Jonathan E. Aberman
Melanie Jeanne Chico
Mark A. Silverman
Molly E. Thompson
Dykema Gossett PLLC
10 S. Wacker Drive, Suite 2300
Chicago, IL 60606

*/s/ Greg Shinall*