**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CIBC Bank USA f/k/a The Private Bank and Trust Company, as Administrative Agent, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 18-cv-3964 |
| v. | ) ) ) | Judge John Z. Lee |
| JH Portfolio Debt Equities, LLC; JH Portfolio, Debt Equities 2, LLC; JH Portfolio Debt Equities 4, LLC; and JH Reviver LLC | ) ) ) ) | Magistrate Judge Daniel G. Martin |
| Defendants. | ) ) | |

## <u>SUPPLEMENTAL DECLARATION OF PAUL BARKES</u>

1.      I am Deputy General Counsel at JH Portfolio Debt Equities LLC ("JHPDE"). I have the authority to make these statements on its behalf.

2.      The statements made in this declaration are based on my personal knowledge and based upon my review of agreements of JH relevant to the matters referenced below. If called to testify as a witness, I would testify consistent with the facts stated herein.

<u>Citibank Credit Facility and Collateral</u>

3.      On or about June 29, 2017, JHCG Holdings LLC ("JHCG Holdings") and JH Capital Group Holdings, LLC ("Capital Group Holdings") entered into a Credit Agreement, dated as of June 29, 2017 (the "Citibank Credit Agreement") with Citibank, N.A. ("Citibank") as "Initial Lender," "Administrative Agent" and "Collateral Agent," pursuant to which Citibank made a loan to JHCG Holdings in the amount of $50 million, which Credit Agreement was amended by a First Amendment to Credit Agreement dated as of December 28, 2017 (as so amended, the "Citibank Credit Agreement").

4.      To secure, among other things, JHCG Holdings' obligations under the Citibank

1

Credit Agreement, JHCG Holdings and Citibank, as Collateral Agent, entered into a Security Agreement (the "Citibank Security Agreement"). (A true and correct copy of the Citibank Security Agreement is attached hereto as Exhibit A.)

5.      In connection with the Citibank Security Agreement, JHCG Holdings, Citibank, as Collateral Agent, and JHPDE entered into a Consent and Agreement dated June 29, 2017 (the "JHPDE Consent and Agreement"). (A true and correct copy of the JHPDE Consent and Agreement is attached hereto as Exhibit B.)

6.      Pursuant to the Citibank Security Agreement, JHCG Holdings granted to Citibank, as Collateral Agent, a security interest in the "Collateral" as defined therein (herein, the "Citibank Collateral"). (Citibank Security Agreement §2.1(a)). The Citibank Collateral includes, without limitation, all of the membership interests of JH Portfolio Debt Equities, LLC ("JHPDE") in which JHCG Holdings has any right, title or interest (the "JHPDE LLC Interests"). (Citibank Security Agreement §1.2 (definition of "Pledged Equity Interests").)

7.      Pursuant to the JHPDE Consent and Agreement, JHCG Holdings and JHPDE agreed that, upon the occurrence of certain events, Citibank, as Collateral Agent, will have "the sole right to exercise any voting rights with respect to the [JHPDE LLC Interests]." (JHPDE Consent and Agreement, Page 1.)

8.      JHCG Holdings is the sole member of JHPDE.

9.      In its [Proposed] Order Appointing Receiver Pursuant to its Motion for Order Appointing Receiver (the "Proposed Order"), CIBC Bank USA ("CIBC") seeks, among other things, to (a) confer on the receiver all powers, authorities, rights and privileges possessed by the members of JHPDE with respect to the Receivership Property ([Proposed] Order Appointing Receiver, § III.A) and (b) suspend all powers of the members of JHPDE with respect to the

Receivership Property (*Id*. §3.B.).

10.     Granting the requested receiver with any of the powers, authorities, rights and privileges of the members of JHPDE and suspending the powers of the members of JHPDE, as requested by CIBC, will be a direct conflict with the rights of Citibank under the Citibank Security Agreement and the JHPDE Consent and Agreement.

Fortress Credit Facility and Collateral

11.     On or about December 28, 2017, JHPDE Finance I, LLC ("Finance I") entered into a Credit Agreement, dated as of December 28, 2017, with the Fortress Credit Corp. ("Fortress") as a lender (together with its successors and assigns, the "Fortress Lenders"), as "Administrative Agent" and as "Collateral Agent," pursuant to which the Fortress Lenders agreed to make loans to Finance I in an aggregate amount of up to $100 million, which Credit Agreement was amended by an Amendment No. 1 to Credit Agreement dated as of June 29, 2018 (as so amended, the "Fortress Credit Agreement").

12.     To secure, among other things, Finance I's obligations under the Fortress Credit Agreement, JHPDE and Fortress, as Collateral Agent, entered into a Pledge Agreement (the "Fortress Pledge Agreement"). (A true and correct copy of the Fortress Pledge Agreement is attached hereto as Exhibit C.)

13.     Contemporaneously with the parties thereto entering into the Fortress Credit Agreement and the Fortress Pledge Agreement, JHPDE, JH Portfolio Debt Equities 2, LLC, JH Portfolio Debt Equities 4, LLC (collectively, the "CIBC Borrowers") entered into an Amendment No. 1 to Security Agreement dated as of December 28, 2017 (the "CIBC Security Agreement Amendment"), amending the Security Agreement, dated as of June 29, 2017 (the "CIBC Security Agreement"). A true and correct copy of the CIBC Security Agreement is attached hereto as Exhibit D, and a true and correct copy of the CIBC Security Agreement

3

Amendment is attached hereto as Exhibit E.

14. Pursuant to the Fortress Pledge Agreement, JHPDE granted to Fortress, as Collateral Agent, a security interest in all of JHPDE's right, title and interest in, to and under (a) 100% of the Class B Membership Interests in Finance I, (b) all claims, demands, causes and choses in action in respect of the foregoing, and (c) all payment on or under and all proceeds in respect of the foregoing (collectively, the "Pledged Finance I Equity Interests"). (Fortress Pledge Agreement §2.1(a).)

15. The CIBC Security Agreement states that the collateral in which CIBC, as Administrative Agent, is being granted a security interest does not include any Excluded Assets as defined therein. (CIBC Security Agreement, §2.1).

16. Pursuant to the CIBC Security Agreement Amendment, the definition of "Excluded Assets" in the CIBC Security Agreement was amended to include within such definition any CIBC Borrower's Equity Interests in Finance I. (CIBC Security Agreement Amendment § 2). Accordingly, by the terms of the CIBC Security Agreement, the Pledged Finance I Equity Interests are not collateral securing the Borrowers' obligations under the Credit Agreement (*See* Doc. 1-1). To further emphasize the exclusion of the Pledged Finance I Equity Interests and other Excluded Assets from CIBC's collateral, the CIBC Security Agreement Amendment states: "For the avoidance of doubt, the Collateral shall not include any Excluded Assets and all Liens on any Excluded Assets in favor of the Administrative Agent are hereby released." (CIBC Security Agreement Amendment, §2).

17. Pursuant to the Proposed Order, CIBC seeks to include within the scope of the Receivership Assets, JHPDE's and any other Defendants' interests in Finance I, which would include the Pledged Finance I Equity Interest. (Proposed Order, Exhibit A).

4

18.     Inclusion of the Pledged Finance I Equity Interests, and the granting of the receiver the powers requested by CIBC with respect thereto, would materially and negatively affect Fortress and Fortress' collateral interest in the Pledged Finance I Equity Interests.  In particular, the Proposed Order would prohibit Fortress from exercising remedies with respect to the Pledged Finance I Equity Interests (Proposed Order, §II), allow the requested receiver to take custody, control and possession of the Pledged Finance I Equity Interests (Proposed Order, §III.D.b.), use the Pledged Finance I Equity Interests for the benefit of the other Receivership Property (Proposed Order, §III.D.d.), restrict Fortress' ability from selling the Pledged Finance I Equity Interest (Proposed Order, §IV.B.a), and prohibit Fortress from exercising the lien granted to it pursuant to the Fortress Pledge Agreement (Proposed Order, §IV.B.b).

[REMAINDER OF THIS PAGE LEFT INTENTIONALLY BLANK.]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 8, 2018.

Signature: _____

Paul Barkes

# EXHIBIT A

[EXECUTION COPY]

SECURITY AGREEMENT

dated as of

June 29, 2017

between

JHCG HOLDINGS LLC

and

CITIBANK, N.A.

as Collateral Agent

SECURITY AGREEMENT dated as of June 29, 2017 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Agreement"), by and between JHCG HOLDINGS LLC, a Delaware limited liability company (the "Grantor"), and CITIBANK, N.A., a national banking association, as Collateral Agent (the "Collateral Agent").

Reference is made to the Credit Agreement, dated as of June 29, 2017 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Credit Agreement"), by and among Grantor, as Borrower thereunder, JH Capital Group Holdings, LLC (the "Parent"), Citibank, N.A., as the Initial Lender, and Citibank, N.A., as Administrative Agent and as Collateral Agent. The Initial Lender has agreed to extend credit to the Grantor subject to the terms and conditions set forth in the Credit Agreement. The obligation of the Initial Lender to extend such credit is conditioned upon, among other things, the execution and delivery of this Agreement. Accordingly, the parties hereto agree as follows:

ARTICLE I.

DEFINITIONS

Section 1.1.   Credit Agreement.  (a)  Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the Credit Agreement.  All terms defined in the New York UCC (as defined herein) and not defined in this Agreement or the Credit Agreement have the respective meanings specified therein; the term "instrument" shall have the meaning specified in Article 9 of the New York UCC.

(b)   The rules of construction specified in Section 1.02 of the Credit Agreement also apply to this Agreement.

Section 1.2.   Other Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Article 9 Collateral" means all Collateral in which a security interest may be created pursuant to Article 9 of the New York UCC.

"Collateral" is defined in Section 2.1.

"Credit Agreement" is defined in the preliminary statement of this Agreement.

"Grantor" is defined in the preliminary statement to this Agreement.

"Limited Liability Company Agreement" is defined in Section 2.1.

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Pledged Equity Interests" means:

(i)      all of the membership interests (as defined in the Limited Liability Company Agreement, as defined below) of JH Portfolio Debt Equities, LLC ("JHPDE"), in which the Grantor has any right, title or interest (the "LLC Interests");

(ii)      all capital accounts relating to the LLC Interests;

(iii)      all other rights of the Grantor under the Limited Liability Company Agreement;

(iv)      all substitutions, interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing; and

(v)      all accounts, contract rights, general intangibles, supporting obligations, chattel paper, instruments, documents, money, deposit accounts, certificates of deposit, goods, letter of credit rights, advices of credit and investment property, in each case in respect of any of the foregoing, all present and future claims, demands, causes of action and choses in action with respect to any of the foregoing, the contents of any of the foregoing that are accounts and all payments on, all income from and all other proceeds from any of the foregoing, including all proceeds of their conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, notes, drafts, acceptances, chattel paper, checks, insurance proceeds, condemnation awards, rights to payment of every kind and all other forms of obligations, instruments and other property that at any time are any part of or are included in the proceeds of any of the foregoing.

"Proceeds" has the meaning specified in Section 9-102 of the New York UCC.

"Secured Parties" means (a) the Lenders, (b) the Administrative Agent and the Collateral Agent, (c) the beneficiaries of each reimbursement, payment or indemnification obligation undertaken by the Grantor under any Loan Document and (d) the successors and assigns of each of the foregoing.

"Security Interest" is defined in Section 2.1.

ARTICLE II.

SECURITY INTERESTS IN PERSONAL PROPERTY

Section 2.1.    Security Interest.  (a)  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Grantor hereby assigns and pledges to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Collateral Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in, all of the Grantor's assets, including the Pledged Equity Interests, the Pledged Accounts, the Servicing Agreement, any and all real and personal property, goods, instruments, equipment, inventory, fixtures, accounts, general intangibles, chattel paper, contract rights, contracts, documents, letter-of-credit rights, supporting obligations and the proceeds of each and all other types of property of the Grantor, wherever located, whether now owned or hereafter acquired, and all additions and accessions thereto and

2

substitutions and replacements therefor and improvements thereon, and all proceeds (whether in the form of cash or other property) and products thereof (including, without limitation, all proceeds of insurance covering the same and all tort claims in connection therewith) (collectively, the "Collateral").

(b)     The Grantor hereby irrevocably authorizes the Collateral Agent at any time and from time to time to file in any relevant jurisdiction any initial financing statements with respect to the Collateral or any part thereof and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment, including whether the Grantor is an organization, the type of organization and any organizational identification number issued to it.  The Grantor agrees to provide such information to the Collateral Agent promptly upon request.  The Grantor also ratifies its authorization for the Collateral Agent to file in any relevant jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(c)     The Security Interest is granted as security only and shall not subject the Collateral Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of the Grantor with respect to or arising out of the Collateral.

(d)     The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations and (ii) a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing a financing statement or analogous document in the United States (or any political subdivision thereof) and its territories and possessions pursuant to the UCC of any applicable jurisdiction.  The Security Interest is and shall be prior to any other Lien on any of the Article 9 Collateral, other than such Liens as are permitted under the Loan Documents that have priority as a matter of law.

Section 2.2.     Representations and Warranties.  The Grantor represents and warrants to the Collateral Agent and the Secured Parties that:

(a)     It has good and valid rights in and title to the Collateral with respect to which it has purported to grant a Security Interest hereunder and has full power and authority to grant to the Collateral Agent the Security Interest in such Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other person other than any consent or approval that has been obtained.

(b)     Exhibit A, setting forth the Grantor's (i) exact legal name, (ii) location of its chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located, (iii) identity or type of organization or corporate structure, (iv) Federal Taxpayer Identification Number or organizational identification number and (v) jurisdiction of organization, is correct and complete as of the Closing Date.

(c)     The Collateral is owned by the Grantor free and clear of any Lien, other than any Lien created by this Agreement or the Credit Agreement.  The Grantor has not filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Collateral or (ii) any assignment in which the Grantor assigns any Collateral or any security agreement or similar instrument covering any Collateral with any foreign governmental, municipal or other office, which financing statement or analogous document, assignment, security agreement or similar instrument is still in effect, except, in each case, for the Lien created by this Agreement or the Credit Agreement.

(d)     The execution, delivery and performance by it under this Agreement (i) have been duly authorized by all necessary corporate action; (ii) do not and will not contravene its charter, by-laws, any law or regulation or any contractual restriction, including, without limitation, any of the terms and conditions of the Limited Liability Company Agreement, binding on or affecting it or any of the Collateral or the Pledged Equity Interests and (iii) do not and will not result in the creation of any lien, security interest or other charge or encumbrance upon or with respect to any of its properties except for any lien and security interest created by this Agreement.

(e)     The Control Agreement has been duly executed and delivered by each of the Grantor and JHPDE and, assuming the due execution and delivery thereof by each of Grantor and JHPDE , constitutes the legal, valid and binding obligation of each of Grantor and JHPDE, enforceable against each such party in accordance with its terms;.

Section 2.3.    <u>Covenants</u>.

(a)     The Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Collateral Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements or other documents in connection herewith or therewith.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note or other instrument, such note or instrument shall be immediately pledged and delivered to the Collateral Agent, duly endorsed in a manner satisfactory to the Collateral Agent.

(b)     At its option, the Collateral Agent may, and upon instructions from the Administrative Agent shall, discharge (subject to receipt of applicable funds) past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Collateral and not permitted pursuant to the Credit Agreement, and may pay for the maintenance and preservation of the Collateral to the extent the Grantor or JHPDE fails to do so as required by the Credit Agreement or this Agreement, and the Grantor agrees to reimburse the Collateral Agent on demand for any payment made or any reasonable expense incurred by the Collateral Agent pursuant to the foregoing authorization; <u>provided</u> that nothing in this paragraph shall be interpreted as excusing the Grantor from the performance of, or imposing any obligation on the Collateral Agent or any Secured Party to cure or perform, any covenants or other promises

4

of the Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(c)     The Grantor shall provide the Collateral Agent prompt written notice of each proposed waiver, amendment, supplement or other modification to, or consent to any amendment, supplement or other modification or waiver of, any provision of the Second Amended and Restated Limited Liability Company Agreement of JHPDE, dated as of June 17, 2016 (the "Limited Liability Company Agreement") of which the Grantor has knowledge, and the Grantor agrees that it shall not exercise any of its rights to waive, amend, supplement or otherwise modify, or consent to any material amendment, material supplement, other material modification or material waiver of, the Limited Liability Company Agreement without the prior written consent of the Collateral Agent (acting at the direction of the Majority Lenders).  For purposes of the foregoing sentence, the term "material" means having any effect whatsoever on the Pledged Equity Interests or on any rights the Administrative Agent, the Collateral Agent or any Lender has under any Loan Documents.

Section 2.4.     Other Actions.  In order to further insure the attachment, perfection and priority of, and the ability of the Collateral Agent to enforce, the Security Interest, the Grantor agrees, at its own expense, to take the following actions with respect to the following Collateral:

(a)     Instruments.  If the Grantor shall at any time hold or acquire any instruments, it shall forthwith endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent or the Administrative Agent may from time to time reasonably request.

(b)     Pledged Accounts.  The Grantor shall arrange for the Collateral Agent or a Lender to be the depositary with respect to each Pledged Account.

Section 2.5.     Control of the Pledged Equity Interests; Perfection.

(a)     On or prior to the date hereof, the Grantor shall cause JHPDE to enter into the Consent and Agreement by and between the Collateral Agent and the Grantor in the form of Exhibit B hereto.

(b)     The Grantor shall, on or prior to the Closing Date, endorse, assign and deliver the LLC Interests to the Collateral Agent, accompanied by instruments of transfer or assignment duly executed in blank.  If the Grantor shall at any time hold or acquire any instruments, it shall forthwith endorse, assign and deliver the same to the Collateral Agent, accompanied by such instruments of transfer or assignment duly executed in blank as the Collateral Agent or the Administrative Agent may from time to time reasonably request.

(c)     The Grantor shall deliver to the Collateral Agent such transfer tax stamps and any other documents or instruments necessary in the reasonable opinion of the Collateral Agent to effect and perfect a legally valid delivery of such security or other item of investment property to the Collateral Agent or any other Person or entity identified as assignee in such instrument of transfer.  Unless otherwise instructed by the Collateral Agent, any delivery of a security or other item of investment property in definitive, certificated form shall be made to Citibank, N.A., 390 Greenwich Street, New York, NY 10013, Attention:  Ari Rosenberg.

5

(d)     If the Grantor shall receive, by virtue of its being or having been an owner of any Pledged Equity Interests, any (i) bond, security certificate (including, without limitation, any certificate representing a stock dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off), promissory note, other instrument or any investment property; (ii) option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Equity Interests, or otherwise; (iii) dividends payable in securities or other property (other than cash) or (iv) dividends or other distributions in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, the Grantor shall receive any such bond, stock certificate, promissory note, instrument, investment property, option, right, payment or distribution (other than distributions or payments of cash) in trust for the benefit of the Collateral Agent for the benefit of the Secured Parties, the Grantor shall deliver it forthwith to the Collateral Agent for the benefit of the Secured Parties in the exact form received, with any necessary endorsement and/or appropriate stock powers duly executed (with a Medallion Guarantee with respect to the signatures thereon) in blank, to be held by the Collateral Agent for the benefit of the Secured Parties as Pledged Equity Interests and as further collateral security for the Secured Obligations.  The right is expressly granted to the Collateral Agent, at its discretion, for the benefit of the Secured Parties, to receive income distributions or distributions following dissolution of JHPDE following an Event of Default under the Credit Agreement and dividends on the Pledged Equity Interests (other than cash dividends) and to hold the same as part of the Pledged Equity Interests or apply the same to the payment of any Obligation, all without notice and without liability except to account for property actually received by it.

(e)     Any promissory notes, bonds, certificates and instruments representing any portion of the Pledged Equity Interests from time to time shall be delivered to (or at the direction of) the Collateral Agent for the benefit of the Secured Parties promptly upon the receipt thereof by or on behalf of the Grantor.  Any such promissory notes, bonds, certificates and instruments shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank (with a Medallion Guarantee with respect to the signatures thereon), all in form and substance satisfactory to the Collateral Agent.  The Grantor further agrees to execute such other documents and to take such other actions as the Collateral Agent deems reasonably necessary or desirable to create and perfect the first priority security interests intended to be created hereunder (and to maintain such first priority perfection), to effect the foregoing and to permit the Collateral Agent to exercise any of its rights and remedies hereunder.

(f)     In addition to the foregoing, the Grantor shall, on or prior to the date hereof, file a Uniform Commercial Code financing statement describing the Pledged Equity Interests with the Secretary of State of the State of Delaware.  The Grantor shall deliver file-stamped copies of such filing to the Collateral Agent no later than five days after the date of such filing.  The Grantor shall maintain the effectiveness of such financing statement until termination of this Agreement.  The Grantor shall not change its corporate form or jurisdiction of incorporation without providing the Collateral Agent 30 days' prior written notice and, prior to such change, filing such financing statements or financing statement amendments as needed in order to maintain the effectiveness of the first priority perfection of the security interest of the Collateral Agent in the Pledged Equity Interests achieved by the filing of the financing statement

referred to in the first sentence of this clause (e) (from the original effectiveness date). The Grantor shall deliver file-stamped copies of such filings to the Collateral Agent no later than 5 days after the date of such filings.

(g)  The Grantor hereby covenants with the Collateral Agent, for the benefit of the Secured Parties, that until the Secured Obligations have been paid in full, the Grantor shall:

(1)  not permit third party rights to arise over or against the LLC Interests or any part thereof or attempt or agree so to do;

(2)  not take or accept any security interest from JHPDE, or, in relation to the Secured Obligations, from any third party, without first obtaining the written consent of the Collateral Agent and

(3)  not claim payment, whether directly or by set-off, lien, counterclaim or otherwise, of any amount which may be or has become due to the Grantor by JHPDE; provided that nothing in this Section 2.5(g) shall prevent the Grantor from receiving distributions or payments of cash in accordance with the Loan Documents. For the avoidance of doubt, the Grantor is permitted hereunder to receive and distribute to its members any and all dividends and distributions and payments of cash that are permitted to be made by JHPDE under the Loan Documents.

Section 2.6.  Certain Additional Representations, Warranties and Covenants of the Grantor Relating to the LLC Interests.

(a)  The Grantor represents and warrants to the Collateral Agent, for the benefit of the Secured Parties, that the Limited Liability Company Agreement constitutes the legal, valid and binding obligation of each party thereto, enforceable against each such party in accordance with its terms.

(b)  The Grantor represents and warrants to the Collateral Agent, for the benefit of the Secured Parties, that the Grantor is the sole owner of, and has good and marketable title to, the LLC Interests, free and clear of all pledges, liens, security interests and other encumbrances except the security interest created by this Agreement.

(c)  Any assignment, pledge, transfer or sale of all or any portion of the LLC Interests pursuant to this Agreement (including, without limitation, in connection with the exercise of remedies) to the Collateral Agent shall be made without any subscription agreement or subscription information form (or equivalent document or any notice requirements related thereto) required by the Limited Liability Company Agreement. For the avoidance of doubt, any assignment, pledge, transfer or sale of all or any portion of the LLC Interests pursuant to this Agreement (including, without limitation, in connection with the exercise of remedies) to a third party otherwise eligible to purchase the LLC Interests pursuant to the Limited Liability Company Agreement (after giving effect to the consents and agreements made pursuant to the Consent and Agreement) (such third party, an "Eligible Purchaser") may be made with a subscription

7

agreement or a subscription information form (or equivalent document or any notice requirements related thereto) as may be required by the Limited Liability Company Agreement.

ARTICLE III.

REMEDIES

Section 3.1.  Remedies Upon Default.  During the existence of an Event of Default, the Grantor agrees to deliver each item of Collateral to the Collateral Agent on demand, and it is agreed that the Collateral Agent shall have, in addition to all rights and remedies of a secured party under the UCC of any applicable jurisdiction, the right (acting at the direction of the Majority Lenders) to take any of or all the following actions at the same or different times:  with or without legal process and with or without prior notice or demand for performance, to take possession of the Collateral and without liability for trespass to enter any premises where the Collateral may be located for the purpose of taking possession of or removing the Collateral and, generally, to exercise any and all rights afforded to a secured party under (and subject to) the Uniform Commercial Code or other applicable law.  Without limiting the generality of the foregoing, the Grantor agrees that the Collateral Agent shall have the right, subject to the mandatory requirements of applicable law and acting at the direction of the Majority Lenders and with not less than ten (10) Business Days' prior written notice to the Grantor, to sell or otherwise dispose of all or any part of the Collateral (including, without limitation, the sale of the Collateral in connection with a securitization thereof) at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Collateral Agent shall deem appropriate; provided that any such public or private sale shall be called and conducted in a manner that complies with applicable law.  The Collateral Agent shall be authorized at any sale of the Collateral (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to persons who will make such representations and agreements as necessary or advisable to ensure compliance with any applicable laws.  Upon consummation of any such sale the Collateral Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold.  Each such purchaser at any sale of Collateral shall hold the property sold absolutely, free from any claim or right on the part of the Grantor, and the Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Collateral Agent shall give the Grantor not less than ten (10) Business Days' prior written notice (which the Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Collateral Agent's intention to make any sale of Collateral (acting at the direction of the Majority Lenders). Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral, or portion thereof, will first be offered for sale at such board or exchange.  Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Collateral Agent may fix and state in the notice (if any) of such sale.  At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Collateral Agent may determine in its sole and absolute discretion (such discretion to be exercised in a manner

consistent with the prior direction of the Majority Lenders). The Collateral Agent shall not be obligated to make any sale of any Collateral if it shall determine (in consultation with the Majority Lenders) not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Collateral Agent may (in consultation with the Majority Lenders), without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, with not less than ten (10) Business Days' prior written notice to the Grantor but otherwise without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Collateral Agent until the sale price is paid by the purchaser or purchasers thereof, but the Collateral Agent shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by and in compliance with law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of the Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from the Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Collateral Agent shall be free (to the extent consistent with the prior direction of the Majority Lenders) to carry out such sale pursuant to such agreement and the Grantor shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Collateral Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full; provided that the cash proceeds of any such sale shall be applied by the Collateral Agent in accordance with Section 3.2. As an alternative to exercising the power of sale herein conferred upon it, the Collateral Agent may proceed (acting at the direction of the Majority Lenders) by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 3.1 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

Section 3.2. Application of Proceeds. The Collateral Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, as follows:

FIRST, to the payment of fees of the Collateral Agent, if any, and all costs and expenses incurred by the Collateral Agent in connection with such collection or sale or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Collateral Agent hereunder or under any other Loan Document on behalf of the Grantor, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document and any other obligations of Grantor in favor of the Collateral

Agent (including, without limitation, indemnity and hold harmless obligations under this Agreement);

SECOND, to the payment in full of the Secured Obligations (in accordance with the provisions of Section 4.01 of the Credit Agreement) in the manner directed by the Instructing Party; and

THIRD, to the Grantor, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Collateral Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement except as directed by the Instructing Party. Upon any sale of Collateral by the Collateral Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Collateral Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Collateral Agent or such officer or be answerable in any way for the misapplication thereof.

## ARTICLE IV.

## MISCELLANEOUS

Section 4.1. Notices. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9.07 of the Credit Agreement.

Section 4.2. Waivers; Amendment. (a) No failure or delay by the Collateral Agent, the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Collateral Agent, the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by the Grantor therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 4.2, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice or demand on the Grantor in any case shall entitle the Grantor to any other or further notice or demand in similar or other circumstances.

(b) Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Collateral Agent and the Grantor, subject to any consent required in accordance with Section 9.1 of the Credit Agreement.

Section 4.3.    <u>Collateral Agent's Fees and Expenses; Indemnification</u>.    The parties hereto agree that the Collateral Agent shall be entitled to reimbursement of its fees and expenses incurred hereunder as provided in <u>Section 9.5</u> of the Credit Agreement.

Section 4.4.    <u>Successors and Assigns</u>.    Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party, and all covenants, promises and agreements by or on behalf of the Grantor or the Collateral Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.  Subject to the applicable provisions of <u>Section 8.3</u> of the Credit Agreement, the Collateral Agent may resign from its role hereunder at any time by notifying the Administrative Agent, the Lenders and the Grantor.

Section 4.5.    <u>Survival of Agreement</u>.    All covenants, agreements, representations and warranties made by the Grantor in the Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Documents shall be considered to have been relied upon by the Lenders and, to the extent made or delivered to the Collateral Agent, by the Collateral Agent and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any Lender or on its behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under any Loan Document is outstanding and unpaid.

Section 4.6.    <u>Counterparts; Effectiveness</u>.    This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in this <u>Section 4.6</u>.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

Section 4.7.    <u>Severability</u>.    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 4.8.    <u>Right of Set-Off</u>.    If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Grantor against any of and all the obligations of the Grantor now or hereafter existing under this Agreement owed to such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement and although such obligations may be unmatured. The rights of each Lender and Affiliate under this <u>Section 4.8</u> are in addition to other rights and remedies (including other rights of set-off) which such Lender or Affiliate may have.

Section 4.9.  Governing Law; Jurisdiction; Consent to Service of Process.  (a)  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)  The Grantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Collateral Agent, the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Grantor or its properties in the courts of any jurisdiction.

(c)  The Grantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any New York State or Federal court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)  Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 4.1.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 4.10.  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 4.10.

Section 4.11.  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 4.12.  Security Interest Absolute.  All rights of the Collateral Agent hereunder, the Security Interest and all obligations of the Grantor hereunder shall be absolute and

unconditional irrespective of (a) any lack of validity or enforceability of the Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing; (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Loan Document or any other agreement or instrument or (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee, securing or guaranteeing all or any of the Obligations.

Section 4.13.  Termination or Release.  (a)  This Agreement, the Security Interest and all other security interests granted hereby shall terminate when all the Secured Obligations (other than contingent indemnification obligations, which shall survive) have been paid in full and the Lenders have no further commitment to lend under the Credit Agreement.

(b)  Upon any sale or other transfer by the Grantor of any Collateral that is permitted under the Credit Agreement, the security interest in such Collateral shall be automatically released.

(c)  In connection with any termination or release pursuant to paragraph (a) or (b), the Collateral Agent shall execute and deliver to the Grantor, at the Grantor's expense and upon receipt from the Grantor of any and all documentation the Collateral Agent may request in support of its determination that the conditions of paragraphs (a) and (b) have been satisfied, all documents that the Grantor shall reasonably request to evidence such termination or release. Any execution and delivery of documents pursuant to this Section 4.13 shall be without recourse to or warranty by the Collateral Agent.

Section 4.14.  Collateral Agent Appointed Attorney-in-Fact.  The Grantor hereby appoints the Collateral Agent the attorney-in-fact of the Grantor for the purpose of taking any action and executing any instrument that the Collateral Agent may deem necessary or advisable to perfect (and to maintain the perfection of) the interest of the Secured Parties in the Collateral and as otherwise expressly provided below, which appointment is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, the Collateral Agent shall have the right, during the existence of an Event of Default, with full power of substitution either in the Collateral Agent's name or in the name of the Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of the Grantor on any invoice or bill of lading relating to any of the Collateral; (d) to send verifications to any trustee or paying agent; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) to endorse, as appropriate, the Pledged Equity Interests, in order to cause a change in the registration of legal owner of the Pledged Equity Interests to the Collateral Agent or its designee and (h) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral,

13

and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Collateral for all purposes; provided that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, to present or file any claim or notice or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby.  The Collateral Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to the Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct.


[Signature page follows.]


14

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

JHCG HOLDINGS LLC, as Grantor,

By: _____
        Name:
        Title: Manager

CITIBANK, N.A., as Collateral Agent,

By: _____
        Name:
        Title:

15

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

JHCG HOLDINGS LLC, as Grantor,

By: _____
      Name:
      Title:

CITIBANK, N.A., as Collateral Agent,

By: _____
      Name: David Mandel
      Title:  Vice President

15

**Exhibit A**

Grantor Information

| 1. | Legal name | JHCG Holdings LLC |
|---|---|---|
| 2. | Location of chief executive office, principal place of business, any additional office in which books and records are maintained or at which Collateral is located | 21800 Oxnard Street, 5th Floor Woodland Hills, CA 91367 |
| 3. | Type of organization or corporate structure | Limited liability company |
| 4. | Federal Taxpayer Identification Number or organizational identification number | |
| 5. | Jurisdiction of organization | Delaware |

16

**EXHIBIT B**

**FORM OF CONSENT AND AGREEMENT**

# EXHIBIT B

[EXECUTION COPY]

## CONSENT AND AGREEMENT

Dated June 29, 2017

JH Portfolio Debt Equities, LLC, a limited liability company formed under the laws of the State of California (the "Limited Liability Company") hereby consents to the pledge and assignment by JHCG Holdings LLC, a Delaware limited liability company (the "Pledgor"), to Citibank, N.A., in its capacity as Collateral Agent (the "Collateral Agent") under the Credit Agreement, dated as of the day hereof (the "Credit Agreement"), by and among JHCG Holdings LLC, as Borrower, JH Capital Group Holdings, LLC (the "Parent"), Citibank, N.A., as the initial Lender (the "Initial Lender"), and Citibank, N.A., as Administrative Agent and as Collateral Agent, of all of the Pledgor's right, title and interest in all of its Member Interests in the Limited Liability Company (including without limitation all of the Pledgor's related rights and benefits under the Limited Liability Company Agreement, the "LLC Interests") as collateral to secure obligations of the Pledgor to the Lenders and the other Secured Parties (as defined in the Security Agreement, dated as of the date hereof, by and between the Limited Liability Company and the Collateral Agent), as set forth in that certain Pledge and Security Agreement (as may be amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Pledge and Security Agreement"), dated as of the date hereof, by and among the Pledgor and the Collateral Agent. Specifically, the Limited Liability Company hereby consents to the terms and conditions of the Pledge and Security Agreement and agrees that, if an Event of a Default occurs under the Loan Documents (as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with their respective terms), then the Collateral Agent shall have all of the rights contemplated in the Pledge and Security Agreement, the Loan Documents and hereunder. Capitalized terms used but not defined herein are used as defined in the Credit Agreement, the Pledge and Security Agreement or the Limited Liability Company Agreement (as defined below), as applicable.

In addition to the foregoing, the Limited Liability Company agrees as follows:

• The pledge of the LLC Interests by the Pledgor to the Collateral Agent for the benefit of the Secured Parties under the Pledge and Security Agreement and, after the occurrence of an Event of Default under and as defined in the Loan Documents, any transfer of ownership of the LLC Interests to the Collateral Agent in connection with the exercise of remedies under the Pledge and Security Agreement are each permitted under the Limited Liability Company Agreement, dated as of the date hereof, relating to the Limited Liability Company (as may be further amended, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Limited Liability Company Agreement") and other related documents.

• (x) The pledge of the LLC Interests is effective with no further acts required of the Pledgor or the Collateral Agent (in particular, but not limited to, execution and acknowledgement of further instruments); (y) each of the Pledge and Security Agreement and the Loan Documents have been delivered to it and (z) prior to the occurrence of an Event of Default, the Collateral Agent shall have no rights or obligations with respect to the LLC Interests and the Pledgor shall retain all obligations associated with the LLC Interests. Subject to the terms and conditions of this Consent and Agreement and the other Loan Documents, the Limited Liability Company shall immediately recognize the Pledgor as the holder of the LLC Interests until it has received written notice from the Collateral Agent of the occurrence of an Event of Default. Upon receipt of written notice from the Collateral Agent of the occurrence of an Event of Default, the Limited Liability Company shall recognize the Collateral Agent as the holder of the LLC Interests having the sole right to exercise any voting rights with respect to the LLC Interests, without any further action by any other Person or entity, and shall take all direction with respect to the LLC Interests solely from the Collateral Agent.

21302194.4

- The Pledgor shall be permitted to exercise all Member voting and limited liability company rights with respect to the LLC Interests unless an Event of Default shall have occurred and be continuing and the Pledgor shall have received notice of the termination of such rights from the Collateral Agent; provided, however, that no vote shall be cast or limited liability company right exercised or other action taken by the Pledgor that could reasonably be expected to impair the Collateral or the Pledged Collateral or that would be inconsistent with or result in any violation of any provision of the Loan Documents. Without the prior written consent of the Collateral Agent (acting at the direction of the Majority Lenders), the Pledgor will not (i) vote to enable, or take any other action to permit, (A) the Limited Liability Company to issue any equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any equity securities of the Limited Liability Company; (B) the Limited Liability Company to sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, any property or assets owned by the Limited Liability Company, other than as expressly permitted by the Loan Documents or (C) the Limited Liability Company to dividend or otherwise make any distribution to its members (other than distributions to the Pledgor in respect of amounts released to the Limited Liability Company in accordance with and pursuant to Section 4.01 of the Credit Agreement); (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral or the Pledged Collateral, other than as contemplated by the Loan Documents; (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral or the Pledged Collateral, or any interest therein, except for the Lien provided for by the Pledge and Security Agreement and the other Loan Documents or (iv) enter into any agreement or undertaking restricting the right or ability of the Limited Liability Company or the Collateral Agent to sell, assign or transfer any of the Collateral or the Pledged Collateral other than as expressly permitted by the Loan Documents or as may otherwise be required by applicable law. The Limited Liability Company acknowledges and agrees that the Pledgor has covenanted to provide the Collateral Agent prompt written notice of each proposed waiver, amendment, supplement or other modification to, or consent to any amendment, supplement or other modification or waiver of, any provision of the Limited Liability Company Agreement of which the Pledgor has knowledge and that the Pledgor has covenanted that it shall not exercise any of its rights to waive, amend, supplement or otherwise modify, or consent to any material amendment, material supplement, other material modification or material waiver of, the Limited Liability Company Agreement without the prior written consent of the Collateral Agent (acting at the direction of the Majority Lenders). For purposes of the foregoing sentence, the term "material" means having any effect whatsoever on the LLC Interests or on any rights the Administrative Agent, the Collateral Agent or any Lender has under any Loan Documents.

- The Limited Liability Company Agreement has not been amended. The Limited Liability Company Agreement shall not be amended or otherwise modified without the prior written consent of the Collateral Agent (acting at the direction of the Majority Lenders).

- The Pledgor is the sole Member of the Limited Liability Company and does not maintain any other equity interest in the Limited Liability Company. The LLC Interests constitute all the issued and outstanding member interests of the Limited Liability Company.

- The Limited Liability Company hereby acknowledges that there are no other transfers, security interests or claims against the LLC Interests registered on the Limited Liability Company's books and records or otherwise known to it.

- The Limited Liability Company will deliver directly to the Collateral Agent, at the applicable address set forth in the Pledge and Security Agreement or such other addresses as the Collateral Agent may direct from time to time, a copy of each statement, notice, request, report, demand or other communication sent by it relating to the Limited Liability Company generally or LLC Interests in

21302194.4

particular, at the same time and in the same manner as sent to the other members of the Limited Liability Company. Notices to the Limited Liability Company may be made to it at: 21800 Oxnard Street, 5th Floor, Woodland Hills, CA 91367, Attn: Glenn Corey.

- The Limited Liability Company will promptly notify the Collateral Agent of any liens, claims or restrictions with respect to the LLC Interests and any adverse claims to which the LLC Interests are or may be subject.

- Subject to any limitations imposed upon the Administrative Agent or its representatives contemplated by the Loan Documents, the Limited Liability Company will permit reasonable inspections by the Collateral Agent of its books and records respecting the LLC Interests and the assets and property of the Limited Liability Company.

- The Limited Liability Company will not register or acknowledge any interest in or claim in respect of the LLC Interests or otherwise transfer the LLC Interests, except for the interests of the Collateral Agent therein and as instructed in writing by the Collateral Agent.

- The Limited Liability Company agrees that, during the continuance of an Event of Default, upon presentation to the Limited Liability Company by the Collateral Agent of an assignment executed by the Collateral Agent, the Limited Liability Company shall register the LLC Interests in the name of the assignee indicated in such assignment, and such assignee shall be entitled to all of the rights of and obligations associated with the LLC Interests without any further action or consent by any other Person or entity.

- The Limited Liability Company will not permit the Pledgor or any other person or entity (other than the Collateral Agent) to redeem, withdraw, assign or transfer any of the LLC Interests.

- The Limited Liability Company agrees that during the continuance of an Event of Default it shall comply with the instructions and directions originated by the Collateral Agent with respect to the LLC Interests, without further consent of the Pledgor or any other person or entity but subject to the terms and conditions of the Pledge and Security Agreement.

- At the request of the Collateral Agent at any time during the continuance of an Event of Default, without notice to or consent from the Pledgor (and notwithstanding contrary communication from the Pledgor), the Limited Liability Company will deal exclusively with the Collateral Agent regarding the LLC Interests and will follow all instructions and directions received from the Collateral Agent permitted by an approved transferee of the LLC Interests, subject in all respects to the terms and conditions of the Pledge and Security Agreement.

- Subject to the terms and conditions of the Pledge and Security Agreement, during the continuance of an Event of Default the Limited Liability Company agrees to effect withdrawals from the capital account related to the LLC Interests (up to the balance of such capital account) at any time requested by the Collateral Agent and to pay all proceeds of such withdrawals directly to the Collateral Agent within two (2) business days of such request.

- The Limited Liability Company agrees that all withdrawal proceeds to be paid for any redemption in respect of the LLC Interests shall be paid directly to the Collateral Agent (for the benefit of the Secured Parties) in cash (in United States dollars in immediately available funds) and not in-kind. The Limited Liability Company further irrevocably waives any right it may have to limit or suspend redemption, withdrawals or payments in respect of the LLC Interests.

21302194.4

- The Limited Liability Company will not require the Collateral Agent to enter into any subscription agreement or subscription information form (or equivalent document) in connection with a transfer of the LLC Interests to the Collateral Agent in the event the Collateral Agent forecloses on the LLC Interests. The Limited Liability Company agrees to use reasonable efforts to accept any subscription agreement or subscription information form (or equivalent document) and to approve the related transfer to a third party in the event the Collateral Agent elects in its sole discretion to transfer the LLC Interests to such third party in connection with the foreclosure on the LLC Interests to the extent permitted by applicable securities laws.

- The Limited Liability Company shall not require the Collateral Agent to make any contributions (other than the initial capital contribution in accordance with the Limited Liability Company Agreement) or mandatory withdrawals in respect of the LLC Interests or to maintain a minimum aggregate investment with respect to the LLC Interests.

The Pledgor, by its acceptance of its Member Interest in the Limited Liability Company, acknowledges and agrees that the rights, obligations and remedies of such Member and its respective successors and assigns under the Limited Liability Company Agreement and with respect to its Member Interest shall be subject in all respects to the terms and provisions of this Consent and Agreement. In the event of any conflict between the terms of the Limited Liability Company Agreement and this Consent and Agreement, this Consent and Agreement shall control to the fullest extent permitted by law.

The Limited Liability Company hereby acknowledges that its agreements and representations contained herein have served to induce the Collateral Agent to extend the credit evidenced or to be evidenced by the Loan Documents. The Limited Liability Company represents that it has the requisite authority to execute and deliver this Consent and Agreement and, further, that such execution and delivery will not contravene or conflict with any agreement, instrument, document or law to which it may be bound and, further, that any necessary determinations by it in order for the Pledge and Security Agreement to be effective have been made and that no approval of any third party is required in order to consummate the transactions contemplated herein or therein. This Consent and Agreement shall automatically terminate upon repayment of all obligations of the Limited Liability Company under the Credit Agreement.

This Consent and Agreement shall be governed by and construed in accordance with the law of the State of New York, except as required by mandatory provisions of law and except to the extent that the validity and perfection or the perfection and the effect of perfection or non-perfection of the security interest created hereby, or remedies hereunder, in respect of any particular Pledged Collateral are governed by the law of a jurisdiction other than the State of New York.

[Signature page follows.]

4

This Consent and Agreement will terminate upon termination of the Pledge and Security Agreement.

JH PORTFOLIO DEBT EQUITIES, LLC

By: _____

Name:

Title:      *Manager*

Acknowledged and Agreed to by:

CITIBANK, N.A.,
as Collateral Agent

By: _____

     Name: David Mandel
     Title:  Vice President

JHCG HOLDINGS LLC

By: _____

     Name:
     Title:

Acknowledged and Agreed to by:


CITIBANK, N.A.,
as Collateral Agent


By:_____

    Name:

    Title:




JHCG HOLDINGS LLC


By:_____

    Name:

    Title: Manager

# EXHIBIT C

PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT is made as of December 28, 2017 (this "Pledge Agreement"), by JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company (the "Pledgor") in favor of FORTRESS CREDIT CORP. ("Fortress"), as Collateral Agent (in such capacity, the "Collateral Agent") on behalf of the Secured Parties.

WITNESSETH:

WHEREAS, reference is made to that certain Credit Agreement, dated as of the date hereof (as it may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Credit Agreement"), among JHPDE Finance I, LLC, as Borrower (the "Borrower"), the Pledgor, as Originator (in such capacity, the "Originator") and as Servicer (in such capacity, the "Servicer"), and Fortress Credit Corp., as Collateral Agent, as Administrative Agent (in such capacity, the "Administrative Agent" and together with the Collateral Agent, the "Agents"), as Lender (in such capacity, the "Lender"); and

WHEREAS, to secure the Obligations (as defined in the Credit Agreement) of the Borrower under the Credit Agreement, the Pledgor has agreed to pledge all of its right, title and interest in and to the Pledged Collateral (as defined herein), to the Collateral Agent on behalf of the Secured Parties.

NOW, THEREFORE, in consideration of the agreements, provisions and covenants herein contained, the Pledgor and the Collateral Agent agree as follows:

ARTICLE I

Section 1.1    Definitions.  All capitalized terms used herein, unless otherwise defined herein, shall have the meaning assigned to them in the Credit Agreement.  As used herein the following terms shall be defined as follows:

"Lien" means, as applied to the property or assets (or the income or profits therefrom) of any Person, in each case whether the same is consensual or nonconsensual or arises by contract, operation of law, legal process or otherwise: (i) any mortgage, lien, pledge, attachment, charge, lease, conditional sale or other title retention agreement, or other security interest or encumbrance of any kind, or (ii) any arrangement, express or implied, under which such property or assets are transferred, sequestered or otherwise identified for the purpose of subjecting or making available the same for the payment of debt or performance of any other obligation in priority to the payment of the general, unsecured creditors of such Person.

"Secured Party" shall mean each of the Agents (including former Agents), each Lender or any of them.

## ARTICLE II

## SECURITY INTERESTS

Section 2.1    Grant of Security.  The Pledgor hereby grants to the Collateral Agent for the benefit of the Secured Parties, a security interest in all of the Pledgor's right, title and interest, whether now owned or hereafter acquired, in, to and under, (a) 100% of the Class B Membership Interests of the Borrower, wherever located, whether consisting of general intangibles or investment property (as those terms are defined in the Uniform Commercial Code as in effect in the State of New York), (b) all present and future claims, demands, causes and choses in action in respect of the foregoing, and (c) all payments on or under and all proceeds of every kind and nature whatsoever in respect of the foregoing (collectively, the "Pledged Collateral").

Section 2.2    Security for Obligations.  This Pledge Agreement secures, and the Pledged Collateral is collateral security for, the prompt and complete payment or performance in full when due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including the payment of amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) (and any successor provision thereof)), of all Obligations (the "Secured Obligations").

## ARTICLE III

## GENERAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.1    Inducing Representations of the Pledgor.  The Pledgor represents and warrants to the Collateral Agent for the benefit of the Secured Parties that:

(a)    Organization.  The Pledgor (i) is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and (iii) is duly qualified and in good standing under the laws of each jurisdiction where the transaction of such business or its ownership of the Pledged Collateral requires such qualification, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.  The chief executive office and the location of the Pledgor's records regarding the Pledged Collateral are located at 21800 Oxnard Street, 5th Floor, Woodland Hills, California 91367.  The Pledgor's legal name is as set forth in this Pledge Agreement, the Pledgor has not changed its name since its creation; and the Pledgor does not have tradenames, fictitious names, assumed names or "doing business as" names, in each case, except as previously disclosed to the Collateral Agent in writing pursuant to the Credit Agreement.

(b)    No Conflicts.  None of the execution and delivery of this Pledge Agreement by the Pledgor, the consummation of the transactions contemplated hereby or the satisfaction of the terms and conditions of this Pledge Agreement:

(i)    conflicts with or results in any breach or violation of any provision of the certificate of formation or limited liability company agreement of Pledgor

129880315v5

or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award currently in effect having applicability to the Pledgor or any of its properties, including regulations issued by any Governmental Authority having supervisory powers over the Pledgor;

(ii)    conflicts with or results in any breach of or constitutes (with due notice or lapse of time or both) a default under any Contractual Obligation of the Pledgor, except as could not reasonably be expected to result in a Material Adverse Effect; or

(iii)    results in or requires the creation of any Lien upon or in respect of any of the Pledgor's assets except the Lien created by this Pledge Agreement.

(c)    <u>Enforceability</u>. The Pledgor has the power, authority and legal right to make, deliver and perform this Pledge Agreement and all of the transactions contemplated hereby and by the other Credit Documents to which it is a party, and has taken all necessary action to authorize the execution, delivery and performance of this Pledge Agreement, and to grant to the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected security interest in the Pledged Collateral (subject to Permitted Liens) on the terms and conditions of this Pledge Agreement. This Pledge Agreement constitutes the legal, valid and binding obligation of the Pledgor, enforceable against it in accordance with its terms, except as the enforceability hereof and thereof may be limited by bankruptcy, insolvency, moratorium, reorganization, conservatorship, receivership, liquidation and other similar laws of general application affecting creditors' rights generally and by general principles of equity (whether such enforceability is considered in a proceeding in equity or at law).

(d)    <u>No Consents, etc.</u> Other than the filing of the financing statement required hereunder, no authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any court, governmental agency or regulatory authority, or with any securities exchange or any other Person is required in connection with (i) the execution, delivery or performance of this Pledge Agreement by the Pledgor, (ii) the assignment of, and the grant of a security interest (including the priority thereof) in the Pledged Collateral by the Pledgor in the manner and for the purpose contemplated by this Pledge Agreement, or (iii) the exercise by the Collateral Agent on behalf of the Secured Parties of the rights provided for in this Pledge Agreement or in the Credit Agreement or the remedies in respect of the Pledged Collateral pursuant to this Pledge Agreement or the Credit Agreement other than remedies requiring prior court approval.

(e)    <u>Adverse Proceedings, etc.</u> There are no Adverse Proceedings pending, individually or in the aggregate, that could reasonably be expected to have a Material Adverse Effect. The Pledgor is not (a) in violation of any applicable laws that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, or (b) subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(f)  <u>Financial Condition</u>.  The Pledgor is and, upon the consummation of the transactions contemplated hereby and by the other Credit Documents on the Closing Date and each Credit Date, will be, Solvent.

(g)  <u>Investment Company</u>.  The Pledgor is not an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company" as such terms are defined in the Investment Company Act of 1940, as amended, and is not otherwise subject to regulation thereunder.

(h)  <u>Title; No Liens</u>.  The Pledgor is the sole legal and beneficial owner of, and has good and marketable title to, the Pledged Collateral, free and clear of all Liens other than Permitted Liens and, to the extent applicable, the security interest created by this Pledge Agreement, and the Pledgor shall defend the Pledged Collateral against all claims and demands of all Persons at any time claiming an interest therein adverse to the Collateral Agent and the Secured Parties other than claims arising from Permitted Liens.  No options, warrants or other agreements with respect to the Pledged Collateral are outstanding.

(i)  <u>Other Financing Statements</u>.  Other than the financing statement (i) naming the Pledgor as debtor and Fortress Credit Corp., as Collateral Agent, as the secured party in accordance with the provisions herein, or (ii) filed in connection with other Permitted Liens, there is no financing statement (or similar statement or instrument of registration under the law of any jurisdiction) covering or purporting to cover any interest of any kind in the Pledged Collateral and so long as any Secured Obligations remain unpaid, the Pledgor shall not file, or authorize to be filed, in any public office any financing statement (or similar statement or instrument of registration under the law of any jurisdiction) except financing statements filed or to be filed in respect of and covering the security interests granted hereby by the Pledgor.

(j)  <u>Information</u>.  All information set forth herein relating to the Pledged Collateral is accurate and complete in all material respects as of the date hereof.

Section 3.2  <u>Obligations of the Pledgor</u>.  The Pledgor further represents, warrants and covenants to the Collateral Agent, for the benefit of the Secured Parties, as of the Closing Date and as of each Credit Date, that:

(a)  <u>Liens or Encumbrances</u>.  Without the prior written consent of the Collateral Agent, the Pledgor will not sell, transfer or convey any interest in, or suffer or permit any Lien or encumbrance to be created upon or with respect to, any of the Pledged Collateral (other than Permitted Liens and Liens created under this Pledge Agreement) during the term of this Pledge Agreement.

(b)  <u>Further Assurances</u>.  The Pledgor will, at its own expense, at any time and from time to time at the request of the Collateral Agent or any Secured Party, do, make, procure, execute and deliver all acts, things, writings, assurances and other documents as may be reasonably requested by the Collateral Agent or any Secured Party to preserve, establish, demonstrate or enforce the Collateral Agent's rights, interests and remedies as created by, provided in, or emanating from this Pledge Agreement.  The Pledgor hereby authorizes the Collateral Agent on behalf of the Secured Parties at any time and from time to time to file in any

4

filing office any financing statements (including amendments and continuation statements) against the Pledgor which are reasonably necessary to perfect the Collateral Agent's and the Secured Parties' security interest hereunder.

(c)     <u>Organizational Procedures</u>.     The Pledgor will observe all organizational procedures required by its certificate of formation, its operating agreement and the laws of its jurisdiction of organization.  The Pledgor will maintain its existence as a limited liability company in good standing under the laws of its jurisdiction of organization and will promptly obtain and thereafter maintain qualifications to do business as a foreign entity in any other state in which it does business and in which it is required to so qualify under applicable law.

(d)     <u>No Merger or Consolidation</u>.  The Pledgor will not enter into any transaction of merger or consolidation in which the Pledgor is not the surviving entity, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution), in each case, without the prior written consent of the Collateral Agent.  The Pledgor will not convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions), all or substantially all of its assets (whether now owned or hereafter acquired), except as contemplated by the terms of the Credit Agreement.

(e)     <u>Collections</u>.  If the Pledgor receives any Collections, the Pledgor will promptly, but in any event no later than within two (2) Business Day of receipt thereof, remit (or cause to be remitted) such Collections to the Collection Account, and until such time, the Pledgor shall hold all Collections received by it in trust for the benefit of the Collateral Agent, on behalf of the Secured Parties.

ARTICLE IV

REMEDIES

Section 4.1     <u>Remedies Upon Event of Default.</u>

(a)     Upon the occurrence and during the continuance of an "Event of Default" under and as defined in the Credit Agreement, the Collateral Agent may, without notice to the Pledgor or the Borrower;

(i)     cause the Pledged Collateral to be transferred to the Collateral Agent's name or the name of its nominee and thereafter exercise as to such Pledged Collateral all of the rights, powers and remedies of an owner;

(ii)     collect by legal proceedings or otherwise all principal, interest and other distributions and other sums due at such time and thereafter payable on account of the Pledged Collateral, and hold all such sums as part of the Pledged Collateral, or apply such sums to the payment of Obligations in such manner and order as the Collateral Agent may decide, in its sole discretion; and

(iii)     enter into any extension, subordination, reorganization, deposit, merger, or consolidation agreement, or any other agreement relating to or affecting the Pledged Collateral, and in connection therewith deposit or surrender

5

control of the Pledged Collateral thereunder, and accept other property in exchange therefor and hold and apply such property or money so received in accordance with the provisions hereof.

(b)    In addition to all the rights and remedies of a lender under the UCC, the Collateral Agent on behalf of the Secured Parties shall have the right, without demand of performance or other demand, advertisement or notice of any kind, except as specified below, to or upon the Pledgor or any other Person (all and each of which demands, advertisements and/or notices are hereby expressly waived to the extent permitted by law), to collect, receive, appropriate and realize upon the Pledged Collateral, or any part thereof and to sell, assign, give an option or options to purchase, contract to sell, or otherwise dispose of, and deliver the Pledged Collateral or any part thereof in one or more parcels in accordance with applicable securities laws and on such terms (including, without limitation, a requirement that any purchaser of all or any part of the Pledged Collateral shall be required to purchase any securities constituting the Pledged Collateral solely for investment and without any intention to make a distribution thereof) as the Collateral Agent, in its sole and absolute discretion, deems appropriate without any liability for any loss due to decrease in the market value of the Pledged Collateral during the period held.  If any notification of intended disposition of the Pledged Collateral is required by law, such notification shall be deemed reasonable and properly given if mailed to the Pledgor, postage prepaid, at least ten (10) days before any such disposition at the address set forth in Section 6.4. Any disposition of the Pledged Collateral or any part thereof may be for cash or on credit or for future delivery without assumption of any credit risk, with the right of the Collateral Agent to purchase all or any part of the Pledged Collateral so sold at any such sale or sales, public or private, free of any equity or right of redemption of the Pledgor, which right of equity is, to the extent permitted by applicable law, hereby expressly waived or released by the Pledgor.

(c)    The Collateral Agent, in its sole discretion, may elect to sell the Pledged Collateral on any credit terms which it deems reasonable.  The sale of any of the Pledged Collateral on credit terms shall not relieve the Borrower of its liability with respect to the Obligations or the Pledgor of its liabilities hereunder.  All payments received by the Collateral Agent, if any, in respect of any sale of the Pledged Collateral shall be applied to the Obligations as and when such payments are received.

(d)    The Pledgor recognizes that it may not be feasible to effect a public sale of all or part of the Pledged Collateral by reason of certain prohibitions contained in the Securities Act, and that it may be necessary to sell privately to a restricted group of purchasers who will be obliged to agree, among other things, to acquire the Pledged Collateral for their own account, for investment and not with a view for the resale thereof.  The Pledgor agrees that private sales may be at prices and other terms less favorable to the seller than if the Pledged Collateral were sold at public sale, and that the Collateral Agent has no obligation to delay the sale of any Pledged Collateral for the period of time necessary to permit the registration of the Pledged Collateral for public sale under the Securities Act.  The Pledgor agrees that a private sale or sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable manner.

(e)    If any consent, approval or authorization of any state, municipal or other governmental department, agency or authority shall be necessary to effectuate any sale or other

disposition (whether full or partial) of the Pledged Collateral, the Pledgor will execute all such applications and other instruments as may be reasonably requested by the Collateral Agent in connection with securing any such consent, approval or authorization, and will otherwise use its commercially reasonable efforts to secure the same.

(f)     Upon any sale or other disposition of the Pledged Collateral, the Collateral Agent shall have the rights to deliver, assign and transfer to the purchaser thereof the Pledged Collateral so sold or disposed of.  Each purchaser at any such sale or other disposition shall hold the Pledged Collateral free from any claim or right of whatever kind of the Pledgor, including any equity or right of redemption of the Pledgor.  The Pledgor specifically waives, to the extent permitted by applicable law, all rights of redemption, stay or appraisal which it may have under any rule of law or statute now existing or hereafter adopted with respect to the Pledged Collateral.

(g)     The Collateral Agent shall not be obligated to make any sale or other disposition of the Pledged Collateral unless the terms thereof shall be satisfactory to the Collateral Agent in its sole discretion.  The Collateral Agent may, without notice or publication, adjourn any private or public sale, and, upon five (5) days' prior written notice to the Pledgor, hold such sale at any time or place to which the same may be so adjourned.  In case of any sale of all or any part of the Pledged Collateral, on credit or future delivery, the Pledged Collateral so sold may be retained by the Collateral Agent until the selling price is paid by the purchaser thereof, but the Collateral Agent shall not incur any liability in case of the failure of such purchaser to take up and pay for the Pledged Collateral so sold and, in case of any such failure, such Pledged Collateral may again be sold as herein provided.

(h)     All of the rights and remedies granted to the Collateral Agent on behalf of the Secured Parties, including but not limited to the foregoing, shall be cumulative and not exclusive and shall be enforceable alternatively, successively or concurrently as the Collateral Agent may in its sole discretion deem expedient.

Section 4.2     Collateral Agent Appointed Attorney-in-Fact.  The Pledgor hereby appoints the Collateral Agent, effective without further act upon the occurrence and during the continuance of an Event of Default under the Credit Agreement, as attorney-in-fact of the Pledgor for the purpose of carrying out the provisions of this Pledge Agreement and taking any action and executing any instrument which the Collateral Agent may deem necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.

Section 4.3     Power of Attorney.  The Pledgor irrevocably makes, constitutes and appoints the Collateral Agent as the Pledgor's true and lawful agent and attorney-in-fact, and in such capacity the Collateral Agent shall have the right upon the occurrence and during the continuance of an Event of Default, with power of substitution for the Pledgor and in the Pledgor's name or otherwise, for the use and benefit of the Collateral Agent:

(a)     to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Collateral or any part thereof;

(b)     to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Pledged Collateral;

(c)     to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Pledged Collateral or to enforce any rights in respect of any Pledged Collateral;

(d)     to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Pledged Collateral;

(e)     to notify, or to require the Pledgor to notify, parties holding Pledged Collateral in accordance with the Collateral Agent's instructions; and

(f)     to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Pledged Collateral, and to do all other acts and things necessary to carry out the purposes of this Pledge Agreement, as fully and completely as though the Collateral Agent were the absolute owner of the Pledged Collateral for all purposes; provided, however, that nothing herein contained shall be construed as requiring or obligating the Collateral Agent to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the Collateral Agent, or to present or file any claim or notice, or to take any action with respect to the Pledged Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken or omitted to be taken by the Collateral Agent with respect to the Pledged Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of the Pledgor or to any claim or action against the Collateral Agent.

It is understood and agreed that the appointment of the Collateral Agent as the agent and attorney-in-fact of the Pledgor for the purposes set forth above is coupled with an interest and is irrevocable.

ARTICLE V

LIABILITY AND INDEMNITY

Section 5.1     Limitation on Liability.  None of the Collateral Agent, any Secured Party, or any of their respective directors, officers or employees shall be liable to the Pledgor or the Borrower for any action taken or omitted to be taken by it or them hereunder, or in connection herewith, except that the Collateral Agent and each Secured Party shall be liable for their own gross negligence, bad faith or willful misconduct.

129880315v5

Section 5.2    Pledgor Indemnity.  The Pledgor hereby indemnifies and holds harmless the Collateral Agent and each Secured Party and any of their respective directors, officers, employees or agents from and against any and all claims, losses, and liabilities arising out of or resulting from this Pledge Agreement (including the enforcement of this Pledge Agreement), except claims, losses or liabilities resulting from the Collateral Agent's or such Secured Party's gross negligence, bad faith or willful misconduct.  Upon demand, the Pledgor will pay to the Collateral Agent for the benefit of the Secured Parties the amount of any and all reasonable and documented out-of-pocket expenses, including the reasonable and documented out-of-pocket fees and disbursements of its counsel and of any experts and agents, which the Collateral Agent may incur in connection with:

(a)    the exercise or enforcement of any of the rights of the Collateral Agent under this Pledge Agreement; and

(b)    the failure by the Pledgor to perform or observe any of the provisions of this Pledge Agreement.

Section 5.3    Survival of Indemnity.  The obligations of the Pledgor contained in Section 5.2 shall survive the termination of this Pledge Agreement and the discharge of the Pledgor's other obligations hereunder.

ARTICLE VI

MISCELLANEOUS

Section 6.1    Termination.  This Pledge Agreement shall continue in full force and effect until the later of (a) the date on which all Obligations have been paid in full in cash (other than contingent indemnification claims) or (b) the earlier of (i) the Maturity Date and (ii) the date on which the Credit Agreement is terminated in accordance with its terms, in each case, at which time this Pledge Agreement shall be automatically terminated and Secured Parties shall promptly execute proper documents to evidence such termination and the release of Secured Parties' security interest in and lien upon the Collateral.

Section 6.2    Compensation and Reimbursement.  The Pledgor agrees for the benefit of the Collateral Agent and the Secured Parties and as part of the Obligations to reimburse the Collateral Agent upon its request for all reasonable and documented out-of-pocket expenses, disbursements and advances incurred or made by the Collateral Agent in accordance with any provision of, or carrying out its duties and obligations under, this Pledge Agreement (including the reasonable and documented out-of-pocket fees, compensation and the expenses and disbursements of its agents, any independent certified public accountants and independent counsel), except any expense, disbursement or advances as may be attributable to gross negligence, bad faith or willful misconduct on the part of the Collateral Agent or Secured Parties, as applicable.

Section 6.3    Foreclosure Expenses of the Collateral Agent.  In accordance with and subject to Section 9.2 of the Credit Agreement, all reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket fees and disbursements of

counsel) incurred by the Collateral Agent in connection with any actual or attempted sale, exchange of, or any enforcement, collection, compromise or settlement with respect to this Pledge Agreement or the Pledged Collateral, or any other action taken by the Collateral Agent hereunder whether directly or as attorney-in-fact pursuant to a power of attorney or other authorization herein conferred, for the purpose of satisfaction of the Obligations shall be deemed an Obligation for all purposes of this Pledge Agreement and the Credit Agreement, and the Collateral Agent may apply the Pledged Collateral to payment of, or reimbursement to itself for, such liability.

Section 6.4    Notices.  Any notice or other communication given hereunder shall be in writing and shall be sent by registered mail, postage prepaid, by overnight courier, personally delivered or telecopied to the recipient as follows:

    (a)    To the Collateral Agent:

        Fortress Credit Corp.
        1345 Avenue of the Americas
        New York, New York 10105
        Attention: Constantine M. Dakolias
        Telecopier No.: (646) 224-8716
        Telephone No.: (212) 798-6050
        E-mail: dbsoloanops@fortress.com

    (b)    To the Pledgor:

        JH Portfolio Debt Equities, LLC
        21800 Oxnard Street, 5th Floor
        Attn: Glenn S. Corey
        Woodland Hills, California 91367
        Email: Glenn@jhcapitalgroup.com

Section 6.5    Waiver.  The failure of the Collateral Agent to exercise, or delay in exercising, any right, power or remedy hereunder, shall not operate as a waiver thereof, nor shall any single or partial exercise by the Collateral Agent of any right, power or remedy hereunder preclude any other or future exercise thereof, or the exercise of any other right, power or remedy. The remedies herein provided are cumulative and are not exclusive of any remedies provided by law or any other agreement.

Section 6.6    Amendments and Modifications; Successors and Assigns; Severability of Provisions.  No amendment, modification, termination or waiver of any provision of this Pledge Agreement, or consent to any departure by the Pledgor therefrom, shall in any event be effective without the written concurrence of each of the parties hereto.  This Pledge Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives and assigns.  If any provision of this Pledge Agreement shall be invalid or unenforceable in any respect or in any jurisdiction, the remaining provisions shall remain in full force and effect and shall be enforceable to the maximum extent permitted by law.

Section 6.7    Counterparts.  This Pledge Agreement may be executed in counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page to this Pledge Agreement by facsimile transmission or other electronic image scan transmission (e.g., "PDF" or "tif" via email) shall be as effective as delivery of a manually signed counterpart of this Pledge Agreement.

Section 6.8    Trial by Jury.  EACH OF THE PLEDGOR AND THE COLLATERAL AGENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN IT RELATING TO THE SUBJECT MATTER OF THIS PLEDGE AGREEMENT OR THIS LOAN TRANSACTION.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH OF THE PLEDGOR AND THE COLLATERAL AGENT ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT IT HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS PLEDGE AGREEMENT, AND THAT IT WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH OF THE PLEDGOR AND THE COLLATERAL AGENT FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 6.8 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE UNDER THE CREDIT AGREEMENT.  IN THE EVENT OF LITIGATION, THIS PLEDGE AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 6.9    Governing Law.  THIS PLEDGE AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW), EXCEPT THAT MATTERS CONCERNING THE VALIDITY AND PERFECTION OF SECURITY INTERESTS COVERED THEREBY SHALL BE GOVERNED BY THE CONFLICTS OF LAW PROVISIONS OF THE APPLICABLE UNIFORM COMMERCIAL CODE.

Section 6.10    CONSENT TO JURISDICTION.

(a)    ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST THE PLEDGOR ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK.    BY EXECUTING AND DELIVERING THIS PLEDGE AGREEMENT, THE PLEDGOR, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE PLEDGOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 6.4 AND TO ANY PROCESS AGENT APPOINTED IN ACCORDANCE WITH SUBPARAGRAPH (b) BELOW IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE PLEDGOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT COLLATERAL AGENT RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST THE PLEDGOR IN THE COURTS OF ANY OTHER JURISDICTION.

(b)    THE PLEDGOR HEREBY AGREES THAT PROCESS MAY BE SERVED ON IT BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE ADDRESSES PERTAINING TO IT AS SPECIFIED IN SECTION 6.4 OR TO C T CORPORATION SYSTEM, 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST THE PLEDGOR IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED ABOVE.  IN THE EVENT CAPITOL SERVICES, INC. SHALL NOT BE ABLE TO ACCEPT SERVICE OF PROCESS AS AFORESAID, THE PLEDGOR SHALL PROMPTLY APPOINT AND MAINTAIN AN AGENT QUALIFIED TO ACT AS AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO THE COURTS SPECIFIED IN THIS SECTION 6.10, AND ACCEPTABLE TO THE COLLATERAL AGENT, AS THE PLEDGOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON THE PLEDGOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION, SUIT OR PROCEEDING.

Section 6.11    Security Interest Absolute.  All rights of the Collateral Agent hereunder, the grant of a security interest in the Pledged Collateral and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of:

(a)    Any claim as to the validity, regularity or enforceability of the Credit Agreement, any other Credit Document, this Pledge Agreement or any other agreement or instrument relating to any of the foregoing;

(b)      Any change in the time, manner or place of payment of, or in any other term of, all of or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the Credit Agreement, any other Credit Document or any other agreement or instrument relating to any of the foregoing;

(c)      Any change in the laws, rules or regulations of any jurisdiction;

(d)      The occurrence of any Event of Default;

(e)      Any exchange, release or non-perfection of Collateral Agent's security interest in any other Collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Secured Obligations; or

(f)      Any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Pledgor in respect of the Secured Obligations or in respect of this Pledge Agreement (other than (i) the indefeasible payment in full of all Secured Obligations (other than contingent indemnification obligations), (ii) a breach of this Pledge Agreement by the Collateral Agent or (iii) a violation of applicable Law by the Collateral Agent in connection with this Pledge Agreement).

[Remainder of Page Intentionally Left Blank]

129880315v5

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Pledge Agreement on the date first above written.

**JH PORTFOLIO DEBT EQUITIES, LLC,**
as Pledgor

By: _____

Name: Douglas Jacobsen
Title: Chief Executive Officer

**FORTRESS CREDIT CORP.,**
as Collateral Agent

By: _____

Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Pledge Agreement on the date first above written.

**JH PORTFOLIO DEBT EQUITIES, LLC,**
    as Pledgor


By: _____
Name:  Douglas Jacobsen
Title:    Chief Executive Officer


**FORTRESS CREDIT CORP.,**
    as Collateral Agent


By: _____
Name:  Constantine M. Dakolias
Title:    President

# EXHIBIT D

SECURITY AGREEMENT

This SECURITY AGREEMENT dated as of June 29, 2017 (this "Agreement"), is executed by and among JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company, JH PORTFOLIO DEBT EQUITIES 2, LLC, a California  limited liability company, JH PORTFOLIO DEBT EQUITIES 4, LLC, a California limited liability company, and JH REVIVER LLC, a Delaware limited liability company (collectively, the "Grantors" and each a "Grantor"), and THE PRIVATEBANK AND TRUST COMPANY, an Illinois state chartered bank, in its capacity as administrative agent (the "Administrative Agent") for the Lenders referred to below.

**W I T N E S S E T H:**

WHEREAS, the Grantors have entered into that certain Second Amended and Restated Credit Agreement dated as of June 29, 2017 (as amended, restated, supplemented or otherwise modified from time to time and in effect, the "Credit Agreement") with various financial institutions party thereto (collectively, the "Lenders" and individually, each a "Lender") and the Administrative Agent, pursuant to which the Lenders have agreed to make certain loans to the Grantors (collectively, the "Loans").

WHEREAS, a condition precedent to the extension of the Loans to the Grantors is the Grantors' execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, each Grantor agrees as follows:

Section 1.    DEFINITIONS.

1.1    Terms Defined in Credit Agreement.  All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

1.2    Other Terms Defined in UCC.  All other capitalized words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms in the UCC, to the extent the same are used or defined therein.

1.3    Definitions of Certain Terms Used Herein.  As used in this Agreement, in addition to the terms defined in the Preliminary Statement, the following terms shall have the following meanings:

"Collateral" shall have the meaning set forth in Section 2.1 hereof.

"Excluded Assets" shall mean, any Grantor's Equity Interests in Credit Control, LLC, any Subsidiary of a Grantor which is the sole owner of Credit Control, LLC and CreditMax Holdings, LLC.

"Intellectual Property" shall mean the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, patents, Proprietary Information, service marks and trademarks, and all registrations and applications for registration therefor and all licensees thereof, trade names, domain names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Note" means any promissory note evidencing loans made by any Grantor to any other Grantor.

"Lien" shall mean, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a Capital Lease) which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, title retention lien, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Loan Document" shall have the meaning set forth in the Credit Agreement.

"Obligations" shall mean the Loans, all interest accrued thereon (including interest which would be payable as post-petition in connection with any bankruptcy or similar proceeding, whether or not permitted as a claim thereunder), any fees due the Administrative Agent hereunder, any expenses incurred by the Administrative Agent hereunder, including without limitation, all liabilities and obligations under this Agreement, under any other Loan Document, any reimbursement obligations of any Grantor in respect of letters of credit and surety bonds, all Hedging Obligations of any Grantor which are owed to the Administrative Agent or any Affiliate of the Administrative Agent, and all Bank Product Obligations of any Grantor, and any and all other liabilities and obligations owed by any Grantor to the Administrative Agent from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, together with any and all renewals, extensions, restatements or replacements of any of the foregoing.

"Person" shall mean any natural person, partnership, limited liability company, corporation, trust, joint venture, joint stock company, association, unincorporated organization, government or agency or political subdivision thereof, or other entity, whether acting in an individual, fiduciary or other capacity.

"Pledged Certificated Stock" means all certificated securities and any other Equity Interests of any Person evidenced by a certificate, instrument or other similar document (as defined in the UCC), in each case owned by any Grantor, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including all Stock and Stock Equivalents listed on Schedule 3.5.

"Pledged Collateral" means, collectively, the Pledged Stock and the Pledged Debt Instruments.

"<u>Pledged Debt Instruments</u>" means all right, title and interest of any Grantor in instruments evidencing any Indebtedness or other obligations owed to such Grantor, in each case with a face value in excess of $10,000 individually and $25,000 in the aggregate, any Intercompany Notes, and any distribution of property made on, in respect of or in exchange for any of the foregoing from time to time, including all Indebtedness described on <u>Schedule 3.5</u>, issued by the obligors named therein.

"<u>Pledged Stock</u>" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"<u>Pledged Uncertificated Stock</u>" means any Equity Interests of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Grantor as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Grantor in, to and under any Organization Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including in each case those interests set forth on <u>Schedule 3.5</u>, to the extent such interests are not certificated.

"<u>Proprietary Information</u>" means all unpatented inventions, discoveries, improvements, processes, methods, formulae, recipes, applications, ideas, customer lists, corporate and other business records, drawings, specifications, descriptions, catalogues, customer contracts, supplier contracts, distributor agreements, confidential information, consulting agreements, proprietary information, marketing plans, business plans, useful information, all know-how obtained by or used in or contemplated at any time for use in the business of the Grantor whether or not such information has been reduced to a writing or other tangible form, all documents and things embodying, incorporating or referring in any way to such information now or hereafter existing, created, acquired or held, whether or not the foregoing is protected by common law or statutory trade secrets.

"<u>UCC</u>" shall mean the Uniform Commercial Code in effect in the State of Illinois from time to time.

1.4    <u>Other Interpretive Provisions</u>.    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.    Whenever the context so requires, the single number includes the plural, and vice versa, and in particular the word "Grantor" shall be so construed. Section and Schedule references are to this Agreement unless otherwise specified.  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.   The term "including" is not limiting, and means "including, without limitation".   In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including".  Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement and the other Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, supplements and other modifications thereto, but only to the extent

3

such amendments, restatements, supplements and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

Section 2.    <u>GRANT OF SECURITY INTEREST</u>.

2.1    <u>Security for Obligations</u>.  As security for the payment and performance of the Obligations, each Grantor does hereby pledge, collaterally assign, transfer and grant to the Administrative Agent for the benefit of the Lenders, a continuing and unconditional security interest in and to all of the personal property now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"), including all of such Grantor's:

(a)    Accounts, Certificated Securities, Chattel Paper, Commercial Tort Claims which are listed on <u>Schedule 2.7</u>, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Financial Assets, Fixtures, General Intangibles, Goods, Health Care Insurance Receivables, Instruments, Intellectual Property, Inventory, Investment Property, Leases, Letter-of-Credit Rights, money (of every jurisdiction whatsoever), Payment Intangibles, Securities, Security Entitlements, Securities Accounts, Supporting Obligations, Tangible Chattel Paper and Uncertificated Securities, other than any interest of a Grantor in the Excluded Assets;

(b)    All Software and computer programs;

(c)    all books and records pertaining to any of the foregoing (regardless of the medium of recording or storage), together with all of such Grantor's right, title and interest in and to all computer software required to utilize, create, maintain and process any such records or data on electronic media; and

(d)    All Proceeds (whether Cash Proceeds or Noncash Proceeds), products, offspring, rents, issues, profits and returns of and from any of the foregoing of the foregoing property, including all insurance policies and proceeds of insurance payable by reason of loss or damage to the foregoing property, including unearned premiums, and of eminent domain or condemnation awards.

Notwithstanding anything to the contrary, the Collateral shall not include any Excluded Assets.

2.2    <u>Financing Statements</u>.    Each Grantor hereby irrevocably authorizes the Administrative Agent at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral is comprised of all assets of such Grantor or words of similar effect, regardless of whether any particular asset comprising a part of the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, and (b) contain any other information required by Section 5 of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or

filing office acceptance of any financing statement or amendment, including whether such Grantor is an organization and the type of organization. Each Grantor agrees to furnish any such information to the Administrative Agent promptly upon request. Each Grantor further ratifies and affirms its authorization for any financing statements and/or amendments thereto, filed by the Administrative Agent in any jurisdiction prior to the date of this Agreement. In addition, the Grantors shall make appropriate entries on their books and records disclosing the Administrative Agent's security interests in the Collateral.

2.3     Other Actions as to any and all Collateral.  Each Grantor further agrees to take any other action reasonably requested by the Administrative Agent to ensure the attachment, perfection and first priority of, and the ability of the Administrative Agent to enforce, the Administrative Agent's security interest in any and all of the Collateral, including (a) causing the Administrative Agent's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the Administrative Agent's security interest in such Collateral, (b) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of the Administrative Agent to enforce, the Administrative Agent's security interest in such Collateral, (c) obtaining third party consents of any licensor or licensee of Intellectual Property or Software, (d) executing, delivering and, where appropriate, filing documents with the appropriate registers of trademarks, patents or copyrights, (e) obtaining governmental and other third party consents and approvals, including any consent of any licensor, lessor or other Person obligated on Collateral, (f) obtaining waivers from mortgagees and landlords in form and substance satisfactory to the Administrative Agent, (g) in the case of Pledged Certificated Stock, Pledged Debt Instruments and Investment Property and any other relevant Collateral, taking any actions necessary to enable the Administrative Agent to obtain "control" (within the meaning of the UCC) with respect thereto, and (h) taking all actions required by the UCC in effect from time to time or by other law, as applicable in any relevant UCC jurisdiction, or by other law as applicable in any foreign jurisdiction.

2.4     Preservation of the Collateral.  The Administrative Agent may, but is not required, to take such actions from time to time as the Administrative Agent reasonably deems appropriate to maintain or protect the Collateral. The Administrative Agent shall have exercised reasonable care in the custody and preservation of the Collateral if the Administrative Agent takes such action as the Grantor Representative shall reasonably request in writing which is not inconsistent with the Administrative Agent's status as a secured party, but the failure of the Administrative Agent to comply with any such request shall not be deemed a failure to exercise reasonable care; provided, however, the Administrative Agent's responsibility for the safekeeping of the Collateral shall (i) be deemed reasonable if such Collateral is accorded treatment substantially equal to that which the Administrative Agent accords its own property, and (ii) not extend to matters beyond the control of the Administrative Agent, including acts of God, war, insurrection, riot or governmental actions. In addition, any failure of the Administrative Agent to preserve or protect any rights with respect to the Collateral against prior or third parties, or to do any act with respect to preservation of the Collateral, not so requested by the Grantor Representative, shall not be deemed a failure to exercise reasonable care in the custody or preservation of the Collateral. The Grantors shall have the sole responsibility for taking such action as may be necessary, from

5

time to time, to preserve all rights of the Grantors and the Administrative Agent in the Collateral against prior or third parties. Without limiting the generality of the foregoing, where Collateral consists in whole or in part of Securities, the Grantors represent to, and covenant with, the Administrative Agent that each Grantor has made arrangements for keeping informed of changes or potential changes affecting the securities (including rights to convert or subscribe, payment of dividends, reorganization or other exchanges, tender offers and voting rights), and the Grantors agree that the Administrative Agent shall have no responsibility or liability for informing any Grantor of any such or other changes or potential changes or for taking any action or omitting to take any action with respect thereto.

2.5     <u>Collateral in Leased Locations or in Possession of a Warehouseman or Bailee</u>. After the occurrence of an Event of Default, if any of the Collateral at any time is located at a leased location or in the possession of a warehouseman or bailee, the Grantors shall promptly notify the Administrative Agent thereof, and upon the Administrative Agent's request shall promptly obtain a Collateral Access Agreement. The Administrative Agent agrees with the Grantors that the Administrative Agent shall not give any instructions to such landlord, warehouseman or bailee pursuant to such Collateral Access Agreement unless an Event of Default has occurred and is continuing, or would occur after taking into account any action by the Grantors with respect to the landlord, warehouseman or bailee.

2.6     <u>Letter-of-Credit Rights</u>. After the occurrence of an Event of Default, if any Grantor at any time is a beneficiary under a letter of credit now or hereafter issued in favor of any Grantor, such Grantor shall promptly notify the Administrative Agent thereof and, at the request and option of the Administrative Agent, such Grantor shall, pursuant to an agreement in form and substance satisfactory to the Administrative Agent, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Administrative Agent of the proceeds of any drawing under the letter of credit, or (ii) arrange for the Administrative Agent to become the transferee beneficiary of the letter of credit, with the Administrative Agent agreeing, in each case, that the proceeds of any drawing under the letter to credit are to be applied as provided in this Agreement.

2.7     <u>Commercial Tort Claims</u>. After the occurrence of an Event of Default, if any Grantor shall at any time hold or acquire a Commercial Tort Claim, such Grantor shall immediately notify the Administrative Agent in writing signed by such Grantor of the details thereof and grant to the Administrative Agent in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, in each case in form and substance satisfactory to the Administrative Agent, and shall execute any amendments hereto deemed reasonably necessary by the Administrative Agent to perfect its security interest in such Commercial Tort Claim, including, amending <u>Schedule 2.7</u>.

2.8     <u>Electronic Chattel Paper and Transferable Records</u>. After the occurrence of an Event of Default, if any Grantor at any time holds or acquires an interest in any electronic chattel paper or any "transferable record", as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, such Grantor shall promptly notify the Administrative Agent thereof and, at the request of the Administrative Agent, shall take such

4841-3473-4150.3
104085\000280

action as the Administrative Agent may reasonably request to vest in the Administrative Agent control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record. The Administrative Agent agrees with the Grantors that the Administrative Agent will arrange, pursuant to procedures satisfactory to the Administrative Agent and so long as such procedures will not result in the Administrative Agent's loss of control, for the Grantors to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or Section 16 of the Uniform Electronic Transactions Act for a party in control to make without loss of control.

2.9    Pledged Stock, Pledged Debt Instruments and Investment Property. Each Grantor hereby authorizes and instructs each issuer of any Pledged Stock, Pledged Debt Instruments and other Investment Property pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Administrative Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from any Grantor, and the Grantors agree that each issuer shall be fully protected in so complying and (ii) after an Event of Default, pay any dividends, distributions or other payments with respect to the Pledged Stock, Pledged Debt Instruments and Investment Property directly to the Administrative Agent. Prior to an Event of Default such Grantor shall be entitled to receive all dividends, distributions or other payments with respect to the Pledged Stock, Pledged Debt Instruments and Investment Property. Such Grantor shall be entitled to exercise all voting, consent and corporate, partnership, limited liability company and similar rights with respect to the Pledged Collateral; provided, however, that no vote shall be cast, consent given or right exercised or other action taken by such Grantor that would materially impair the Collateral or result in any violation of any provision of any Loan Document.

Section 3.    REPRESENTATIONS AND WARRANTIES. Each Grantor makes the following representations and warranties to the Administrative Agent and the Lenders, each of which shall survive the execution and delivery of this Agreement:

3.1    Ownership of Properties; Liens. The Grantors are the sole owner of all of their properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and the like), other than Liens permitted by the Credit Agreement.

3.2    Security Interest. This Agreement creates a valid security interest in favor of the Administrative Agent for the benefit of the Lenders in the Collateral and, when properly perfected by filing in the appropriate jurisdictions, or by possession or Control of such Collateral by the Administrative Agent or delivery of such Collateral to the Administrative Agent, shall constitute a valid, perfected, first-priority security interest in such Collateral and not subject to any other Liens other than Liens permitted by the Credit Agreement.

7

3.3     Place of Business; Locations.   As of the date of this Agreement, Schedule 3.3 attached hereto sets forth each place of business of each Grantor, and whether such locations are owned or leased (and if leased, specifies the complete name and notice address of each lessor).

3.4     Intellectual Property.   Schedule 3.4 lists all Intellectual Property owned by each Grantor in its own name on the date hereof.   All material Intellectual Property owned by any Grantor is valid, subsisting, unexpired and enforceable and has not been abandoned.   Except as set forth in Schedule 3.4, none of the material Intellectual Property is the subject of any licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.   Each Grantor owns and possesses or has a license or other right to use all Intellectual Property as is necessary for the conduct of the businesses of such Grantor, without any infringement upon rights of others.

3.5     Pledged Collateral.     The Pledged Stock pledged by such Grantor hereunder (i) is, as of the date hereof, listed on Schedule 3.5 and constitutes that percentage of the issued and outstanding equity of all classes of each issuer thereof as set forth on Schedule 3.5, (ii) has been duly authorized, validly issued and is fully paid and nonassessable (other than Pledged Stock in limited liability companies and partnerships) and (iii) constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, except to the extent enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally or by equitable principles relating to enforceability.   As of the Closing Date, all Pledged Collateral (other than Pledged Uncertificated Stock) and all Investment Property consisting of instruments and certificates have been delivered to the Administrative Agent or its designees to the extent required by and in accordance with Section 4.6.

3.6     Complete Information.   The Credit Agreement, this Agreement and all schedules, certificates, agreements, contracts, and other materials and information heretofore or contemporaneously herewith furnished in writing by the Grantors to the Administrative Agent for purposes of, or in connection with, the Credit Agreement, this Agreement and the transactions contemplated thereby and hereby is, and all information hereafter furnished by or on behalf of the Grantors to the Administrative Agent pursuant hereto or in connection herewith will be, true and accurate in every material respect on the date as of which such information is dated or certified, and none of such information is or will be incomplete by omitting to state any material fact necessary to make such information not misleading in light of the circumstances under which made.

Section 4.     COVENANTS.

4.1     Field Audits and Verifications.   The Grantors shall permit the Administrative Agent to inspect the Collateral, other tangible assets and/or other business operations of the Grantors and each Subsidiary, to perform appraisals of the Collateral of the Grantors and each Subsidiary, and to inspect, audit, check and make copies of, and extracts from, the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to the Collateral, the results of which must be reasonably satisfactory to the Administrative Agent.   Additionally, the Administrative Agent shall have the right to make such

8

verification concerning each Grantor's business, Accounts and other Collateral as the Administrative Agent may consider reasonable under the circumstances.

4.2    <u>Maintain Insurance</u>.  The Grantors shall maintain with financially sound and reputable insurance companies not Affiliates of the Grantors, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons, including, without limitation, terrorism insurance or as otherwise reasonably required by the Administrative Agent. The Grantors shall deliver such evidence of insurance as is required by the Credit Agreement.

4.3    <u>Business Activities; Change of Legal Status and Organizational Documents</u>.  No Grantor shall, and shall not permit any Subsidiary to, (a) engage in any line of business other than the businesses engaged in on the date hereof and businesses reasonably related thereto, (b) change its name, its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure, or (c) permit its Organizational Documents to be amended or modified in any way which could reasonably be expected to materially adversely affect the interests of the Administrative Agent.

4.4    <u>Place of Business; Collateral Locations</u>.  No Grantor shall change its principal place of business, the location of its books and records, except as permitted by the Credit Agreement.

4.5    <u>Intellectual Property</u>.

(a)    Each Grantor will (i) continue to use each trademark material to its business in order to maintain such trademark in full force free from any claim of abandonment for non-use, (ii) maintain as in the past the quality of products and services offered under such trademark, (iii) use such trademark with the appropriate notice of registration and all other notices and legends required by applicable law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such trademark unless the Administrative Agent shall obtain a perfected security interest in such mark, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such trademark may become invalidated or impaired in any way.

(b)    No Grantor will do any act, or omit to do any act, whereby any patent material to its business may become forfeited, abandoned or dedicated to the public. Each Grantor (i) will employ each copyright material to its business and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby any material portion of such copyrights may become invalidated or otherwise impaired.  No Grantor will (either itself or through licensees) do any act whereby any material portion of such copyrights may fall into the public domain.  Each Grantor (either itself or through licensees) will not do any act that knowingly uses any Intellectual Property material to its business to infringe the intellectual property rights of any other Person.

9

(c)     Each Grantor will notify the Administrative Agent immediately if it knows, or has reason to know, that any application or registration relating to any material Intellectual Property may become forfeited, abandoned or dedicated to the public, or of any adverse determination or development (including the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court or tribunal in any country) regarding, such Grantor's ownership of, or the validity of, any material Intellectual Property or such Grantor's right to register the same or to own and maintain the same.

(d)     Whenever a Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, such Grantor shall promptly report such filing to the Administrative Agent and provide an update to Schedule 3.10.  Upon the request of the Administrative Agent, such Grantor shall execute and deliver, and have recorded, any and all agreements, instruments, documents, and papers as the Administrative Agent may request to evidence the Administrative Agent's security interest in any copyright, patent or trademark and the goodwill and general intangibles of such Grantor relating thereto or represented thereby. Each Grantor will take all reasonable and necessary steps to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of all material Intellectual Property owned by it.

(e)     In the event that any material Intellectual Property is infringed upon or misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify the Administrative Agent after it learns thereof and, to the extent, in its reasonable judgment, such Grantor determines it appropriate under the circumstances, sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution.

4.6     Pledged Collateral.  Such Grantor shall promptly when available and in any event within five (5) days after the end of each month, deliver to the Administrative Agent or its designee, in suitable form for transfer and in form and substance reasonably satisfactory to the Administrative Agent, (i) all Pledged Certificated Stock, (ii) all Pledged Debt Instruments and (iii) all certificates and instruments evidencing Investment Property.

4.7     Ordinary Course of Business.  Notwithstanding anything to the contrary contained in this Agreement, prior to an occurrence of an Event of Default, each Grantor may settle, compromise and collect Proceeds from Accounts or dispose of any Eligible Portfolio in the ordinary course of its business, free and clear of the security interest created hereby (provided (a) the Cash received from any such settlement, compromise, collection or disposal remains subject to the security interested created herein and (b) immediately after any such settlement, compromise, collection or disposal the Revolving Loan Limit shall exceed the Aggregate

10

Revolving Credit Exposure), except to the extent any such settlement, compromise, collection or disposal is prohibited under the express terms of the Credit Agreement.

Section 5.     <u>EVENTS OF DEFAULT AND THEIR EFFECT</u>.

5.1     <u>Events of Default</u>.  The Grantors, without notice or demand of any kind, shall be in default under this Agreement upon the occurrence of any of the following events (each an "<u>Event of Default</u>").

(a)     <u>Default under Credit Agreement</u>.  The existence of any Event of Default under the Credit Agreement.

(b)     <u>Misrepresentation</u>.  The existence of any inaccuracy or untruth in any material respect in any representation or warranty contained in this Agreement.

(c)     <u>Nonperformance</u>.  The failure of the Grantors to comply with or to perform any provision of this Agreement or the Loan Documents (and not constituting an automatic Event of Default under any provision of the Credit Agreement) and continuance of such failure for fifteen (15) days after the earlier to occur of (x) knowledge of such failure by any Grantor and (y) receipt by such Grantor of written notice of such default from the Administrative Agent.

5.2     <u>Effects of Events of Default</u>.  Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have all rights, powers and remedies set forth in the Loan Documents, in any written agreement or instrument (other than this Agreement or the Loan Documents) relating to any of the Obligations or any security therefor, as a secured party under the UCC or as otherwise provided at law or in equity.  In addition to the foregoing, upon the occurrence and during the continuation of an Event of Default:

(a)     <u>Possession and Assembly of Collateral</u>.  The Administrative Agent may, without notice, demand or legal process of any kind, take possession of any or all of the Collateral (in addition to Collateral of which the Administrative Agent already has possession), wherever it may be found, and for that purpose may pursue the same wherever it may be found, and may at any time enter into any of any Grantor's premises where any of the Collateral may be or is supposed to be, and search for, take possession of, remove, keep and store any of the Collateral until the same shall be sold or otherwise disposed of and the Administrative Agent shall have the right to store and conduct a sale of the same in any of any Grantor's premises without cost to the Administrative Agent. At the Administrative Agent's request, each Grantor will, at the Grantors' sole expense, assemble the Collateral and make it available to the Administrative Agent at a place or places to be designated by the Administrative Agent which is reasonably convenient to the Administrative Agent and the Grantors.

(b)     <u>Sale of Collateral</u>.  The Administrative Agent may sell any or all of the Collateral at public or private sale, upon such terms and conditions as the Administrative Agent may reasonably deem proper, and the Administrative Agent may purchase any or

11

all of the Collateral at any such sale.  Each Grantor acknowledges that the Administrative Agent may be unable to effect a public sale of all or any portion of the Collateral because of certain legal and/or practical restrictions and provisions which may be applicable to the Collateral and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers.  Each Grantor consents to any such private sale so made even though at places and upon terms less favorable than if the Collateral were sold at public sale, provided that the Administrative Agent provides at least ten (10) calendar days' notice before the date of an intended disposition and such disposition is commercially reasonable.  The Administrative Agent shall have no obligation to clean-up or otherwise prepare the Collateral for sale.  The Administrative Agent shall apply the net proceeds, after deducting all reasonable costs, expenses, reasonable attorneys' and paralegals' fees incurred or paid at any time in the collection, protection and sale of the Collateral and the Obligations, as set forth in Section 8.03 of the Credit Agreement, returning the excess proceeds, if any, to the Grantors.  The Grantors shall remain liable for any amount remaining unpaid after such application, with interest at the Default Rate.  Any notification of intended disposition of the Collateral required by law shall be conclusively deemed reasonably and properly given if given by the Administrative Agent at least ten (10) calendar days before the date of such disposition.  Each Grantor hereby confirms, approves and ratifies all acts and deeds of the Administrative Agent relating to the foregoing, and each part thereof, and expressly waives any and all claims of any nature, kind or description which it has or may hereafter have against the Administrative Agent or its representatives, by reason of taking, selling or collecting any portion of the Collateral.  Each Grantor expressly absolves the Administrative Agent and the Lenders from any loss or decline in market value of any Collateral by reason of delay in the enforcement or assertion or nonenforcement of any rights or remedies under this Agreement.

(c)      Standards for Exercising Remedies.  To the extent that applicable law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Administrative Agent (a) to fail to incur expenses reasonably deemed significant by the Administrative Agent to prepare Collateral for disposition or otherwise to complete raw material or work-in-process into finished goods or other finished products for disposition, (b) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of, (c) to fail to exercise collection remedies against Account Debtors or other Persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (d) to exercise collection remedies against Account Debtors and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (e) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (f) to contact other Persons, whether or not in the same business as the Grantors, for expressions of interest in acquiring all or any portion of the Collateral, (g) to hire one or more professional auctioneers to assist in the

disposition of Collateral, whether or not the collateral is of a specialized nature, (h) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (i) to dispose of assets in wholesale rather than retail markets, (j) to disclaim disposition warranties, including any warranties of title, (k) to purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of Collateral, or (l) to the extent reasonably deemed appropriate by the Administrative Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any of the Collateral. Each Grantor acknowledges that the purpose of this section is to provide non-exhaustive indications of what actions or omissions by the Administrative Agent would not be commercially unreasonable in the Administrative Agent's exercise of remedies against the Collateral and that other actions or omissions by the Administrative Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this section. Without limitation upon the foregoing, nothing contained in this section shall be construed to grant any rights to any Grantor or to impose any duties on the Administrative Agent that would not have been granted or imposed by this Agreement or by applicable law in the absence of this section.

(d)     <u>UCC and Offset Rights</u>.  The Administrative Agent may exercise, from time to time, any and all rights and remedies available to it under the UCC or under any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any other agreements between any Obligor and the Administrative Agent, and may, without demand or notice of any kind, appropriate and apply toward the payment of such of the Obligations, whether matured or unmatured, including costs of collection and reasonable attorneys' and paralegals' fees, any indebtedness of the Administrative Agent to any Obligor, however created or arising, including balances, credits, deposits, accounts or moneys of such Obligor in the possession, control or custody of, or in transit to the Administrative Agent. Each Grantor hereby waives the benefit of any law that would otherwise restrict or limit the Administrative Agent or any Lender in the exercise of its right, which is hereby acknowledged, to appropriate at any time hereafter any such indebtedness owing from the Administrative Agent and the Lenders to the Grantors.

(e)     <u>Additional Remedies</u>.  The Administrative Agent shall have the right and power to:

(i)     instruct each Grantor, at its own expense, to notify any parties obligated on any of the Collateral, including any Account Debtors, to make payment directly to the Administrative Agent of any amounts due or to become due thereunder, or the Administrative Agent may directly notify such obligors of the security interest of the Administrative Agent, and/or of the assignment to the Administrative Agent of the Collateral and direct such obligors to make payment to the Administrative Agent of any amounts due or to become due with respect

13

thereto, and thereafter, collect any such amounts due on the Collateral directly from such Persons obligated thereon;

(ii)     enforce collection of any of the Collateral, including any Accounts, by suit or otherwise, or make any compromise or settlement with respect to any of the Collateral, or surrender, release or exchange all or any part thereof, or compromise, extend or renew for any period (whether or not longer than the original period) any indebtedness thereunder;

(iii)     take possession or control of any proceeds and products of any of the Collateral, including the proceeds of insurance thereon;

(iv)     transfer the whole or any part of securities which may constitute Collateral into the name of the Administrative Agent or the Administrative Agent's nominee without disclosing, if the Administrative Agent so desires, that such securities so transferred are subject to the security interest of the Administrative Agent, and any corporation, association, or any of the managers or trustees of any trust issuing any of such securities, or any transfer agent, shall not be bound to inquire, in the event that the Administrative Agent or such nominee makes any further transfer of such securities, or any portion thereof, as to whether the Administrative Agent or such nominee has the right to make such further transfer, and shall not be liable for transferring the same;

(v)     vote the Collateral;

(vi)     make an election with respect to the Collateral under Section 1111 of the Bankruptcy Code or take action under Section 364 or any other section of the Bankruptcy Code; provided, however, that any such action of the Administrative Agent as set forth herein shall not, in any manner whatsoever, impair or affect the liability of the Grantors hereunder, nor prejudice, waive, nor be construed to impair, affect, prejudice or waive the Administrative Agent's rights and remedies at law, in equity or by statute, nor release, discharge, nor be construed to release or discharge, the Grantors, any guarantor or other Person liable to the Administrative Agent for the Obligations; and

(vii)     at any time, and from time to time, accept additions to, releases, reductions, exchanges or substitution of the Collateral, without in any way altering, impairing, diminishing or affecting the provisions of this Agreement, the Loan Documents, or any of the other Obligations, or the Administrative Agent's rights hereunder, under any Note or under any of the other Obligations.

Each Grantor hereby ratifies and confirms whatever the Administrative Agent may do with respect to the Collateral and agrees that the Administrative Agent shall not be liable for any error of judgment or mistakes of fact or law with respect to actions taken in connection with the Collateral.

5.3     Attorney-in-Fact.   Each Grantor hereby irrevocably makes, constitutes and appoints the Administrative Agent (and any officer of the Administrative Agent or any Person designated by the Administrative Agent for that purpose) as such Grantor's true and lawful proxy and attorney-in-fact (and agent-in-fact) in such Grantor's name, place and stead, with full power of substitution, to (i) upon the occurrence and continuance of an Event of Default, take such actions as are permitted in this Agreement, (ii) execute such financing statements and other documents and to do such other acts as the Administrative Agent may require to perfect and preserve the Administrative Agent's security interest in, and to enforce such interests in the Collateral, and (iii) upon the occurrence and continuance of an Event of Default, carry out any remedy provided for in this Agreement, including endorsing such Grantor's name to checks, drafts, instruments and other items of payment, and proceeds of the Collateral, executing change of address forms with the postmaster of the United States Post Office serving the address of such Grantor, changing the address of such Grantor to that of the Administrative Agent, opening all envelopes addressed to the Grantors and applying any payments contained therein to the Obligations.  Each Grantor hereby acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable.  Each Grantor hereby ratifies and confirms all that such attorney-in-fact may do or cause to be done by virtue of any provision of this Agreement.

5.4     No Marshaling.  The Administrative Agent shall not be required to marshal any present or future collateral security (including this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order.  To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Administrative Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

5.5     Application of Proceeds.  The Administrative Agent will, promptly and in any event within three (3) Business Days after receipt of cash or solvent credits from collection of items of payment, proceeds of Collateral or any other source, apply the whole or any part thereof against the Obligations secured hereby as set forth in Section 8.03 of the Credit Agreement.

5.6     No Waiver.  No Event of Default shall be waived by the Administrative Agent except in writing. No failure or delay on the part of the Administrative Agent in exercising any right, power or remedy hereunder shall operate as a waiver of the exercise of the same or any other right at any other time; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.  There shall be no obligation on the part of the Administrative Agent to exercise any remedy available to the Administrative Agent in any order.  The remedies provided for herein are cumulative and not exclusive of any remedies provided at law or in equity.  Each Grantor agrees that in the event that any Grantor fails to perform, observe or discharge any of its Obligations or liabilities under this Agreement or any other agreements with the Administrative Agent, no remedy of law will provide adequate relief to the Administrative Agent, and further

15

agrees that the Administrative Agent shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

5.7    Costs, Fees and Expenses.   If at any time or times hereafter the Administrative Agent: (x) employs counsel for advice or other representation (i) with respect to this Agreement or the other Loan Documents, (ii) to represent the Administrative Agent in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by the Administrative Agent, a Grantor, or any other Person) in any way or respect relating to this Agreement, the other Loan Documents or any Grantor's business or affairs, or (iii) to enforce any rights of the Administrative Agent against any Grantor or any other Person that may be obligated to the Administrative Agent by virtue of this Agreement or the other Loan Documents; (y) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (z) attempts to or enforces any of the Administrative Agent's rights or remedies under the Agreement or the other Loan Documents, the reasonable costs and expenses incurred by the Administrative Agent in any manner or way with respect to the foregoing, shall be part of the Obligations, payable by the Grantors to the Administrative Agent on demand.

Section 6.    MISCELLANEOUS.

6.1    Notices.   All notices, requests, demands and other communications provided for hereunder shall be in writing and addressed as follows:

|  |  |
|---|---|
| To the Grantors: | JH Portfolios Debt Equities, LLC<br>21800 Oxnard Street, 5th Floor<br>Woodland Hills, CA 91367<br>Attention:  Glenn Corey |
| With a copy to: | |
| To the Administrative Agent: | The PrivateBank and Trust Company<br>120 South LaSalle Street<br>Chicago, Illinois 60603<br>Attention:  Matthew Berman |
| With copy to: | DYKEMA GOSSETT PLLC<br>10 South Wacker Drive, Suite 2300<br>Chicago, Illinois 60606<br>Attention:  Gary P. Segal |

or, as to each party, at such other address as shall be designated by such party in a written notice to each other party complying as to delivery with the terms of this subsection.  All notices addressed as above shall be deemed to have been properly given (i) if served in person, upon acceptance or refusal of delivery; (ii) if mailed by certified or registered mail, return receipt requested, postage prepaid, on the third (3rd) day following the day such notice is deposited in any post office station or letter box; or (iii) if sent by recognized overnight courier, on the first

(1st) day following the day such notice is delivered to such carrier. No notice to or demand on any Grantor in any case shall entitle any Grantor to any other or further notice or demand in similar or other circumstances.

6.2     Entire Agreement.  This Agreement, together with the other Loan Documents, supersedes all negotiations, representations, warranties, commitments, term sheets, discussions, negotiations, offers or contracts (of any kind or nature, whether oral or written) prior to or contemporaneous with the execution hereof with respect to any matter, directly or indirectly related to the terms of this Agreement and the other Loan Documents.  This Agreement and the other Loan Documents are the result of negotiations among the Administrative Agent, the Lenders, the Grantors and the other parties thereto, and have been reviewed (or have had the opportunity to be reviewed) by counsel to all such parties, and are the products of all parties. Accordingly, this Agreement and the other Loan Documents shall not be construed more strictly against the Administrative Agent or any Lender merely because of the Administrative Agent's involvement in their preparation.

6.3     Amendments; Waivers.  No delay on the part of the Administrative Agent in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by the Administrative Agent of any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.  No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the other Loan Documents shall in any event be effective unless the same shall be in writing and acknowledged by the Administrative Agent, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

6.4     Governing Law.  THIS AGREEMENT AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF ILLINOIS.

6.5     FORUM SELECTION AND CONSENT TO JURISDICTION.

(a)     EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF ILLINOIS SITTING IN COOK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE NORTHERN DISTRICT OF ILLINOIS, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION

17

OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH ILLINOIS STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST A GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(b) EACH GRANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN PARAGRAPH (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c) EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 6.1. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

6.6 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

6.7 <u>Assignability</u>. The Administrative Agent may at any time assign the Administrative Agent's rights in this Agreement upon an assignment of the Obligations or any part thereof as set forth in the Credit Agreement, and transfer the Administrative Agent's rights in any or all of the Collateral, and the Administrative Agent thereafter shall be relieved from all liability with respect to such Collateral. No Grantor may sell or assign this Agreement, either

18

voluntarily or by operation of law, without the prior written consent of the Administrative Agent. All references herein to the Grantor shall be deemed to include any successors, whether immediate or remote.

6.8 <u>Enforceability</u>. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by, unenforceable or invalid under any jurisdiction, such provision shall as to such jurisdiction, be severable and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

6.9 <u>Counterparts; Facsimile Signatures</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt of an executed signature page to this Agreement by facsimile or other electronic transmission shall constitute effective delivery thereof. Electronic records of executed Loan Documents maintained by the Administrative Agent shall deemed to be originals thereof.

6.10 <u>Indemnification</u>. Each Grantor agrees to defend (with counsel satisfactory to the Administrative Agent), protect, indemnify, exonerate and hold harmless each Indemnitee from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including the disbursements and the reasonable fees of counsel for each Indemnitee thereto), which may be imposed on, incurred by, or asserted against, any Indemnitee (whether direct or indirect and whether based on any federal, state or local laws or regulations, including securities laws, Environmental Laws, commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation, execution and delivery of this Agreement and the Loan Documents, including the making or issuance and management of the Loans, the use or intended use of the proceeds of the Loans, the enforcement of the Administrative Agent's rights and remedies under this Agreement, the Loan Documents, any Note, any other instruments and documents delivered hereunder, or under any other agreement between any Grantor and the Administrative Agent; <u>provided</u>, <u>however</u>, that the Grantors shall not have any obligations hereunder to any Indemnitee with respect to matters determined by a court of competent jurisdiction by final and nonappealable judgment to have been caused by or resulting from the willful misconduct or gross negligence of such Indemnitee. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Grantors shall satisfy such undertaking to the maximum extent permitted by applicable law. Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnitee on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by each Indemnitee until paid by the Grantors, shall be added to the Obligations of the Grantors and be secured by the Collateral. The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

6.11     Release of Security Interests.  Upon the full and indefeasible payment in cash of all Obligations and the irrevocable termination of all commitments of the Lenders under the Credit Agreement, the security interests granted hereby shall terminate and all rights to the Collateral shall revert to the applicable Grantors, and the Administrative Agent shall execute and deliver to the Grantors, at the Grantors' expense, all termination statements, releases and other documents which the Grantors shall reasonably, in each case, request to evidence such termination and authorize the filing of any such termination, release or other document executed and delivered by the Administrative Agent.

[Remainder of the page is intentionally blank; signature page on next page]

20

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Agreement as of the date first above written.

BORROWERS:

JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company

By: JHCG Holdings LLC
Its: Managing Member

    By: JH Capital Group Holdings LLC
    Its: Sole Manager

       By:_____
          Douglas C. Jacobsen, sole Manager

JH PORTFOLIO DEBT EQUITIES 2, LLC, a California limited liability company

By:_____
   Douglas C. Jacobsen, Manager

JH PORTFOLIO DEBT EQUITIES 4, LLC, a California limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

    By: JHCG Holdings LLC
    Its: Managing Member

       By: JH Capital Group Holdings LLC
       Its: Sole Manager

         By:_____
            Douglas C. Jacobsen, sole Manager

JH REVIVER LLC, a Delaware limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

    By: JHCG Holdings LLC
    Its: Managing Member

       By: JH Capital Group Holdings LLC
       Its: Sole Manager

         By:_____
            Douglas C. Jacobsen, sole Manager

Signature Page to Security Agreement

IN WITNESS WHEREOF, each Grantor and the Administrative Agent have executed this Agreement as of the date first above written.

BORROWERS:

JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company

By:_____
    Douglas C. Jacobsen, managing member

JH PORTFOLIO DEBT EQUITIES 2, LLC, a California limited liability company

By:_____
    Douglas C. Jacobsen, Manager

JH PORTFOLIO DEBT EQUITIES 4, LLC, a California limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

By:_____
    Douglas C. Jacobsen, managing member

JH REVIVER LLC, a Delaware limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

By:_____
    Douglas C. Jacobsen, managing member

ADMINISTATIVE AGENT:

THE PRIVATEBANK AND TRUST COMPANY

By: _____
Matthew Berman, Associate Managing Director

21

## **SCHEDULE 2.7**
## **COMMERCIAL TORT CLAIMS**

None

## SCHEDULE 3.3
## LOCATIONS

| LOCATION<br><br>OR PLACE OF BUSINESS (INCLUDING CHIEF EXECUTIVE OFFICE) | OWNER/LESSOR<br>(IF LEASED) |
|---|---|
| 5757 Phantom Drive<br>Suite 330<br>Hazelwood, MO, 63042 | Leased<br><br>Landlord : 5757 Phantom LLC |
| 21800 Oxnard St.<br>Suite 500<br>Woodland Hills, CA, 91367 | Leased<br><br>Landlord : Douglas Emmett 2000, LLC |

4841-3473-4150.3
104085\000280

## SCHEDULE 3.4

## INTELLECTUAL PROPERTY

**SCHEDULE 3.5**
**PLEDGED COLLATERAL**

**Grantor**

| | Subsidiary | % Owned | Nature of Interest |
|---|---|---|---|
| JH Portfolio Debt Equities, LLC | JH Portfolio Debt Equities 2, LLC | 100% | Voting/Management |
| JH Portfolio Debt Equities, LLC | JH Portfolio Debt Equities 4 LLC | 96.1553% | Voting/Management |
| JH Portfolio Debt Equities, LLC | RBE Capital Partners LLC | 50% | Voting |
| JH Portfolio Debt Equities, LLC | JH Reviver LLC | var | |
| JH Portfolio Debt Equities, LLC | JH Met Asset Entity LLC | var | |
| JH Portfolio Debt Equities, LLC | JH CX Asset Entity LLC | var | |

# EXHIBIT E

AMENDMENT NO. 1
TO SECURITY AGREEMENT

This Amendment No. 1 to Security Agreement (this "Amendment") is dated as of December 28, 2017, and is among and is among JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company, JH PORTFOLIO DEBT EQUITIES 2, LLC, a California limited liability company, JH PORTFOLIO DEBT EQUITIES 4, LLC, a California limited liability company, and JH REVIVER LLC, a Delaware limited liability company (collectively, the "Grantors"), and CIBC BANK USA (f/k/a The Private Bank and Trust Company)in its capacity as administrative agent (the "Administrative Agent") for the Lenders referred to below.

W I T N E S S E T H :

WHEREAS, the Grantors, the Administrative Agent and various financial institutions party thereto (collectively, the "Lenders" and individually, each a "Lender") are parties to that certain Second Amended and Restated Credit Agreement dated as of June 29, 2017 (as it may be amended, restated, modified or supplemented and in effect from time to time, the "Credit Agreement");

WHEREAS, in connection with the Credit Agreement, the Grantors and the Administrative Agent entered into that certain Security Agreement dated as of June 29, 2017 (as it may be amended, restated, modified or supplemented and in effect from time to time, the "Security Agreement"); and

WHEREAS, the Grantors, the Lenders and the Administrative Agent desire to amend the Credit Agreement (the "Credit Agreement Amendment") and one of the conditions precedent to the closing of the transactions contemplated by the Credit Agreement Amendment is the execution and delivery of this Amendment by the Grantors and the Administrative Agent.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      Definitions.  Capitalized terms used in this Amendment and not otherwise defined herein are used with the meanings given such terms in the Security Agreement.

2.      Amendment.  The Security Agreement is hereby amended by amending the definition of "Excluded Assets" set forth in Section 1.3 in its entirety as follows:

"Excluded Assets" shall mean, (a) any Grantor's Equity Interests in Credit Control, any Subsidiary of a Grantor which is the sole owner of Credit Control, LLC and CreditMax Holdings, LLC, (b) any Grantor's Equity Interests in JHPDE Finance I, LLC or JHPDE Finance 2, LLC, (c) all Excluded Subsidiary Portfolios and (d) all proceeds of the foregoing.

For avoidance of doubt, the Collateral shall not include any Excluded Assets and all Liens on any Excluded Assets in favor of the Administrative Agent are hereby released.

3.      Reaffirmation and Confirmation of Security Interests.  Each Grantor hereby confirms to the Administrative Agent that such Grantor has granted to the Administrative Agent a security interest in or lien upon substantially all of the property of such Grantor, including without limitation all Collateral, to secure the Obligations.  Each Grantor hereby reaffirms its grant of such security interest and lien to the Administrative Agent for such purpose in all respects.

4.    Miscellaneous.

(a)    This Amendment may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same document.

(b)    This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(c)    Section captions and headings used in this Amendment are for convenience only and are not part of and shall not affect the construction of this Amendment.

(d)    This Amendment shall be a contract made under and governed by the laws of the State of Illinois, without regard to conflict of laws principles.  Whenever possible, each provision of this Amendment shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment.

(e)    From and after the date of execution of this Amendment, any reference to the Security Agreement contained in any notice, request, certificate or other instrument, document or agreement shall mean the Security Agreement as amended hereby unless the context otherwise requires.

[Remainder of page is intentionally blank; signature page follows]

4841-2507-3241.1
104085\000280

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date first set forth above.

BORROWERS:

JH PORTFOLIO DEBT EQUITIES, LLC, a California limited liability company

By: JHCG Holdings LLC
Its: Managing Member

By: JH Capital Group Holdings LLC
Its: Sole Manager

By:_____
Douglas C. Jacobsen, sole Manager

JH PORTFOLIO DEBT EQUITIES 2, LLC, a California limited liability company

By:_____
Douglas C. Jacobsen, Manager

JH PORTFOLIO DEBT EQUITIES 4, LLC, a California limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

By: JHCG Holdings LLC
Its: Managing Member

By: JH Capital Group Holdings LLC
Its: Sole Manager

By:_____
Douglas C. Jacobsen, sole Manager

JH REVIVER LLC, a Delaware limited liability company

By: JH Portfolio Debt Equities, LLC
Its: Manager

By: JHCG Holdings LLC
Its: Managing Member

By: JH Capital Group Holdings LLC
Its: Sole Manager

By:_____
Douglas C. Jacobsen, sole Manager

*Signature Page to Amendment No. 1 to Security Agreement*

ADMINISTRATIVE AGENT:

CIBC BANK USA (f/k/a The Private Bank and Trust Company), as Administrative Agent

By: _____

Matthew Berman, Managing Director

*Signature Page to Amendment No. 1 to Security Agreement*

4841-2507-3241.1
104085\000280